STATE OF CONNECTICUT *v.* ROBERT J. BRETON, SR.
(SC 15876)

Sullivan, C. J., and Norcott, Palmer, Zarella, Foti, Schaller and Mihalakos, Js.

328

(*One justice dissenting*)

Argued September 9, 2002—officially released June 24, 2003

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Lisa J. Steele*, special public defender, with whom, on the brief, was *David B. Bachman*, special public defender, for the appellant (defendant) on the proportionality review.

*Harry Weller*, senior assistant state's attorney, with whom were *John A. Connelly*, state's attorney, and, on the brief, *Maureen M. Keegan*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Robert J. Breton, Sr., appeals from a sentence of death imposed after his conviction of capital felony in violation of General Statutes (Rev. to 1987) § 53a-54b (8).[1] The defendant was charged with one count of capital felony and two counts of murder in violation of General Statutes § 53a-54a (a)[2] for the intentional killings of his former wife, JoAnn Breton, and his son, Robert J. Breton, Jr. After a jury convicted the defendant of all counts, a separate sentencing hearing was conducted pursuant to General Statutes (Rev. to 1995) § 53a-46a,[3] at which the same

---

[1] General Statutes (Rev. to 1987) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[3] General Statutes (Rev. to 1995) § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge or judges who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted

jury considered further evidence. At the conclusion of

(1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if (A) the defendant was convicted upon a plea of guilty; (B) the defendant was convicted after a trial before three judges as provided in subsection (b) of section 53a-45; or (C) if the jury which determined the defendant's guilt has been discharged by the court for good cause or, (3) before the court, on motion of the defendant and with the approval of the court and the consent of the state.

"(c) In such hearing the court shall disclose to the defendant or his counsel all material contained in any presentence report which may have been prepared. No presentence information withheld from the defendant shall be considered in determining the existence of any mitigating or aggravating factor. Any information relevant to any mitigating factor may be presented by either the state or the defendant, regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall he governed by the rules governing the admission of evidence in such trials. The state and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any mitigating or aggravating factor. The burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury or, if there is no jury, the court shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury or, if there is no jury, the court finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury or, if there is no jury, the court finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release.

the sentencing phase of the trial, the jury found an aggravating factor and no mitigating factor. In accordance with the jury's findings, the trial court rendered judgment of guilty of capital felony and imposed the death penalty on the defendant. The defendant then appealed to this court pursuant to General Statutes § 51-199 and General Statutes (Rev. to 1995) § 53a-46b.[4] We

"(g) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (e), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (e) that . . . (4) the defendant committed the offense in an especially heinous, cruel or depraved manner . . . ." Unless otherwise noted, all references and citations in this opinion to § 53a-46a will be to that statute as revised to 1995.

[4] General Statutes (Rev. to 1995) § 53a-46b provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. In addition to its authority to correct errors at trial, the supreme court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating factor specified in subsection (h) of section 53a-46a; or (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed

concluded that there were ambiguities in the special verdict form and in the trial court's jury instructions in the sentencing phase of the trial and, accordingly, we reversed the judgment imposing the death penalty and remanded the case for a new penalty phase hearing. *State* v. *Breton*, 235 Conn. 206, 260, 663 A.2d 1026 (1995) (*Breton II*).

On remand, the defendant elected to hold his new penalty phase hearing before a three judge panel pursuant to General Statutes (Rev. to 1995) § 53a-46a (b) and General Statutes §§ 53a-45 (b)[5] and 54-82 (b).[6] The chief court administrator appointed a panel, consisting of Judges Fasano, Damiani and Vertefeuille (panel), to hear the case. At the hearing, the state claimed as an aggravating factor that the defendant had committed the offense in an especially cruel manner within the meaning of § 53a-46a (h) (4). The defendant claimed

and the validity of the sentence." Unless otherwise noted, all references and citations in this opinion to § 53a-46b will be to that statute as revised to 1995.

[5] General Statutes § 53a-45 (b) provides: "If a person indicted for murder or held to answer for murder after a hearing conducted in accordance with the provisions of section 54-46a waives his right to a jury trial and elects to be tried by a court, the court shall be composed of three judges designated by the Chief Court Administrator or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly."

[6] General Statutes § 54-82 provides in relevant part: "(a) In any criminal case, prosecution or proceeding, the party accused may, if he so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon.

"(b) If the accused is charged with a crime punishable by death or imprisonment for life and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or his designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly. . . ."

two statutory and twenty-five nonstatutory mitigating factors.[7]

The panel found that the state had proved beyond a reasonable doubt that the defendant had committed

---

[7] The defendant claimed as statutory mitigating factors that, at the time of the offense: (1) his mental capacity was significantly impaired, but not so impaired as to constitute a defense to the prosecution; and (2) his ability to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to the prosecution. See General Statutes (Rev. to 1995) § 53a-46a (g) ("[t]he mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following . . . (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution").

The defendant claimed as nonstatutory mitigating factors that: (1) at the time of the offense, his mental capacity was impaired, but not so impaired as to constitute a statutory mitigating factor; (2) at the time of the offense, his ability to conform his conduct to the requirements of the law was impaired, but not so impaired as to constitute a statutory mitigating factor; (3) at the time of the offense, he was suffering from an extreme emotional disturbance; (4) at the time of the offense, his mental capacity was significantly impaired, and he suffered from an extreme emotional disturbance that constituted a defense to the prosecution, which, although not presented in the guilt phase, the court could consider as a nonstatutory mitigating factor; (5) he was under the influence of alcohol and prescription medication at the time of the offense; (6) his mother gave him up to live at an orphanage as well as other homes because he was in the way and she could not or would not properly care for him; (7) his mother herself was the product of a broken home, was abandoned by her own parents, lived in an orphanage and was ill-prepared to raise him properly; (8) upon his return from the orphanage it was readily apparent that the defendant had suffered severe and traumatic abuse at the orphanage; (9) he was significantly and traumatically affected by his abandonment by his parents; (10) he was raised in a pathological, alcoholic and abusive family unit; (11) his mother was an alcoholic and she lacked the necessary mothering skills to raise her son properly; (12) his father almost never worked or supported his family and drank excessively on a daily basis; (13) the defendant was subjected to verbal, physical and emotional abuse at the hands of both of his parents; (14) he was the product of a broken home that lacked the necessary love, affection, support and nurturing that is critical to proper social and childhood development; (15) his formal education ended before completion of the eighth grade; (16) despite his low level of education, he has a long history of steady employment and has led a productive life; (17) as a teenager, he worked and contributed to the household; (18) he worked hard to support his family for nineteen

both murders in an especially cruel manner. The panel also found that the defendant had proved by a preponderance of the evidence the factual underpinnings of certain claimed nonstatutory mitigating factors,[8] but that none of the proved facts alone or in combination constituted mitigation considering all of the facts and circumstances of the case. In accordance with those findings, the panel rendered judgment sentencing the defendant to death. The defendant then appealed to this court.

On appeal, the defendant claims that: (1) after the close of evidence, the panel improperly refused to grant a continuance to investigate newly discovered evidence that the defendant claims would have established a new mitigating factor, namely, that he was suffering from a mental impairment at the time that he killed his father in 1966;[9] (2) the state improperly failed to disclose,

years; (19) he has been a model prisoner; (20) mercy; (21) considerations of fairness and mercy constitute a basis for a sentence of life without the possibility of release; (22) there exists a factor concerning the facts and circumstances of the case that has not been specifically mentioned in this list that the court can consider in fairness and mercy as constituting a basis for imposing on him a sentence of life imprisonment with no possibility of release rather than sentencing him to death; (23) there exists a factor in his character, history and/or background that has not been specifically mentioned in this list that the court can consider in fairness and mercy as constituting a basis for a sentence of life without the possibility of release; (24) any of the previously listed factors taken either individually or in combination with any other factor, although not an excuse for the offense, in fairness or mercy provides a reason for a sentence of life without the possibility of release; and (25) death is not the appropriate sentence for the defendant.

[8] Specifically, the panel found that the defendant (1) was neglected, abandoned and the product of an abusive family unit during his childhood; (2) had been a model prisoner at all times since his incarceration for the murders; (3) dropped out of school at age sixteen; and (4) was a good employee and a productive worker.

[9] The defendant initially claimed that the newly discovered evidence would have proved the unconsidered mitigating factor that he was insane at the time of the murders of his former wife and son. He withdrew that claim, however, at oral argument before this court.

prior to the penalty phase hearing, evidence that the defendant could have used to prove a mitigating factor involving his mental and volitional impairment;[10] (3) the panel arbitrarily concluded that the defendant's proved factual claims pertaining to mitigation were not mitigating under the facts and circumstances of this case; (4) the panel improperly found that the defendant's mental and volitional impairment was not a mitigating factor;[11] (5) the panel improperly failed to consider the cumulative effect of the defendant's mitigating evidence; (6) the panel improperly considered mitigating evidence produced by the defendant as proof of the aggravating factor; (7) the panel's failure to articulate the basis of its verdict violated the eighth amendment to the United States constitution[12] and the defendant's constitutional right to due process; (8) the trial court improperly failed to hold a hearing to determine whether the existence of racial disparities in the administration of the death penalty in Connecticut violated the defendant's constitutional and statutory rights; (9) there was insufficient evidence that the defendant committed the capital felony in an especially cruel manner; (10) the cruel, heinous and depraved aggravating factor is unconstitutional; (11) § 53a-46a is unconstitutional on its face and as applied because it provides no meaningful limits on the sentencer's consideration of mitigating factors; and (12) Connecticut's capital sentencing

[10] The defendant withdrew this claim at oral argument before this court. We discuss it briefly in connection with our review of the defendant's first claim, however, to provide context for the withdrawal of the claim.

[11] The defendant did not separately brief this claim, but addressed it in the portion of his brief pertaining to his claim that the panel improperly had found that certain proved factual claims were not mitigating in nature. Because this claim is conceptually distinct, however, we address it separately.

[12] The eighth amendment to the United States constitution, which is made applicable to the states through the fourteenth amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

scheme violates the eighth amendment and article first, §§ 8 and 9, of the Connecticut constitution.[13] In this appeal, we also conduct mandatory proportionality review of the defendant's sentence pursuant to General Statutes (Rev. to 1995) § 53a-46b.

## I

## FACTS

As set forth in *Breton II*, supra, 235 Conn. 212–14, the jury reasonably could have found the following facts at the guilt phase of the defendant's trial. "The defendant and JoAnn Breton were married in 1967, and had one child, Robert Breton, Jr. [Robert, Jr.]. In January, 1987, JoAnn Breton was divorced from the defendant. Shortly after the divorce, JoAnn and Robert, Jr., then fifteen years old, moved to a two-story apartment located in Waterbury.

"On Saturday, December 12, 1987, at approximately 10 p.m., the defendant went to the Sears Castaway Lounge in Waterbury, where he had several drinks. At the lounge, the defendant introduced himself to Mary-Jane Modeen, and the two talked and danced for several hours until the bar closed. At around 2 a.m. on Sunday, December 13, the defendant and Modeen left the bar together and drove in the defendant's truck to his apartment. They remained in the defendant's apartment for only a few minutes, however, because the defendant told Modeen that he had to go some place else. The defendant thereupon drove Modeen home.

"After dropping Modeen off at her home at around 2:45 a.m., the defendant drove to the apartment complex

---

[13] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions . . . [n]o person shall . . . be deprived of life, liberty or property without due process of law . . . ."

The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

in which his former wife and son resided. The defendant entered their apartment and proceeded to the upstairs bedroom where JoAnn Breton was sleeping. The defendant, wielding a sharp, five inch knife, proceeded to beat and stab her viciously. Struggling to escape from the defendant's attack, JoAnn Breton managed to move across the room and away from the defendant. The defendant caught her, however, and continued his assault, inflicting multiple bruises, scrapes and knife wounds on her face, chest and neck. The defendant finally killed his former wife by thrusting the knife into and through her neck, transecting the carotid artery, a wound from which she bled to death.

"Robert, Jr., was asleep in his bedroom when he was awakened by his mother's cries for help. At some point prior to his mother's death, Robert, Jr., entered her bedroom, where he, too, was attacked by the defendant. Although bleeding from a gash on his right forearm and severe cuts on his hands and fingers, Robert, Jr., escaped from the bedroom to a nearby landing area between the first and second floors, and then proceeded down the stairway to the first floor. The defendant pursued Robert, Jr., down the stairs, overtaking him at the bottom of the staircase. The defendant then resumed his attack on Robert, Jr., repeatedly stabbing him in the face, chest, shoulder and neck. Robert, Jr., as did his mother, bled to death from a knife wound that severed his carotid artery.

"After the killings, the defendant left the apartment. Later that Sunday evening, he went to work at the Somers Thin Strip Company. On Monday morning, December 14, the defendant met a friend and coworker, Domenic Aurigemma and the two men drove to JoAnn Breton's apartment. The defendant went to the front door of the apartment while Aurigemma remained in the defendant's truck. The defendant quickly returned to his truck and told Aurigemma that the door to the

apartment was locked and that the doorknob appeared to be stained with blood. After Aurigemma had also inspected the doorknob, the police were called. The police, with the assistance of the building superintendent, entered the apartment. There the police found the body of Robert, Jr., clad only in his underwear and covered with blood, lying at the foot of the stairs leading to the second floor with his head propped up against the wall. They also found the body of JoAnn Breton, similarly clad and covered with blood, lying face up on the floor of the upstairs bedroom." Id.

The following additional evidence was presented at the second penalty phase hearing. Walter Borden, a psychiatrist, testified that he initially had been retained by the office of the chief public defender to perform a forensic psychiatric evaluation of the defendant in connection with the defendant's first penalty phase hearing. In connection with his evaluation, Borden interviewed the defendant and certain of the defendant's family members, including his sister, Catherine Bunker, and his aunt, Ruth Breton, and reviewed certain psychological reports and public records pertaining to the defendant. Borden testified at the second penalty phase hearing that, during the course of his review, he learned the following relevant facts.

Public welfare records dating from the time of the defendant's early childhood indicated that the defendant's mother, then named Hazel Duffney, was unable to care for him and that her home was unfit for a child. At a very young age, perhaps when he was as young as one year, the defendant had been placed in an orphanage for a period of time. Family members reported that, when the defendant later was returned to his family, he was emaciated, mute and unkempt and would not allow anyone to touch him.

At the time that the defendant was born, his mother was not married to the defendant's putative father,

Roland Breton (father), but to another man. The defendant's parents were married approximately two years after his birth, and the issue of the defendant's paternity was an ongoing and open source of friction between them.

During the defendant's childhood, his father was a heavy drinker who became abusive when he drank. He repeatedly threatened to kill the defendant. The defendant's mother also was an alcoholic. At one point, the defendant found her passed out in the gutter. She appeared to have been beaten. Another time, she killed and dismembered the family's pet cat and distributed the body parts around the house. When money was not available to purchase alcohol, she would prostitute herself to a package store owner in exchange for drinks. She would then openly taunt her husband about her sexual relations with other men. She also extorted money from her mother-in-law by threatening to harm the defendant and his sister if the money was not provided.

To discipline the defendant, his mother would strip him from the waist down and beat him with a belt on his buttocks and genitals. When the defendant entered his teenage years, his mother habitually lay around the house unclothed and drinking. When he was thirteen, his mother made a sexual advance on the defendant by attempting to grab his penis. At that point, the defendant ran away from home. He later was found by the police and brought back.

When the defendant was sixteen he joined the Navy. He was unable, however, to conform to the structure of naval life or to follow orders, and he was discharged after only two months. He then returned to his mother's home.

When the defendant was seventeen, he broke into a neighbor's apartment intending to steal money, but he

did not take anything. During the break-in, the defendant spilled some powder on his shoes. Police investigating the break-in located the defendant by following the trail of the powder to the apartment where the defendant and his mother lived. Shortly thereafter, the defendant left his mother's home and went to live with his grandmother and his father.

After the defendant moved in with his father, the issue of the defendant's paternity continued to be a source of antagonism between them. When the defendant was eighteen or nineteen, he and his father had a heated argument over the issue, during which his father said that he was going to obtain the defendant's birth certificate to prove that he was the defendant's biological father. The birth certificate, however, did not resolve the issue.

After that point, the relationship between the defendant and his father became even more strained. The defendant's father continued to be a heavy drinker who was abusive, threatening and belligerent toward the defendant, his own mother and others. He habitually carried a knife with him when he left the house.

On December 3, 1966,[14] the defendant's father left the house to go drinking. It was later reported that, while out drinking, the defendant's father stated that the time had come to kill the defendant. The defendant was at home with his grandmother, who had just prepared a meal for them to eat, when the defendant's father came in, threatened the defendant, pushed the kitchen table against him and threw him up against the wall. The defendant retreated into the bathroom to escape from

[14] The transcript of the April 16, 1997 penalty phase hearing reflects that Borden stated that the defendant killed his father on December 3, 1967. The transcript of the examination of the defendant taken by the county detective immediately after the killing, however, indicates that the actual date of the killing was December 3, 1966.

his father and told his grandmother to call the police. The defendant's father then attacked his grandmother.

The defendant's memory about what happened next was not clear. Borden testified that the defendant told him that he remembered picking up a knife and seeing his father fall, apparently hurt. The defendant did not remember stabbing him, however. The defendant then ran out of the house, found a police officer to whom he indicated that his father had been hurt and brought the officer back to the house. The defendant's father died of multiple stab wounds to the chest and face. Ultimately, the defendant confessed to the killing. He pleaded guilty to manslaughter and received a suspended sentence. Borden testified that the defendant told him that he did not clearly recall stabbing his father, but admitted that he must have done so.[15]

Shortly after the defendant killed his father, he met his wife, JoAnn Breton. He married her in December, 1967,[16] within a few days of the first anniversary of his father's death. The defendant was very dependent on his wife for stability and psychological support, but their marriage was stormy. Borden testified that the defendant was pathologically jealous of other men, paranoid and delusional, and that these conditions derived from a belief that he could not be loved and from a profound distrust of other people. Borden provided the following anecdote, reported to him by the defendant, as an example of the defendant's paranoia. At one point early in the marriage, the defendant's wife

[15] Borden's testimony was not clear as to whether the defendant had told him that, at the time he confessed to the killing, he had been unable clearly to recall it or, at the time of the interview with Borden, his memory was unclear.

[16] The transcript of the April 16, 1997 penalty phase hearing reflects that Borden stated that the defendant married his wife in December, 1968. In light of the fact that the defendant killed his father on December 3, 1966, however; see footnote 14 of this opinion; it is apparent that the marriage took place in December, 1967.

left the house after a fight. The defendant went out to look for her and, when he found her on the street, thought that she appeared disheveled. The defendant immediately concluded that she had been raped. They then went to a coffee shop together, where they encountered three men. The defendant concluded that those were the men who had raped his wife. For years after the incident, the defendant continued to believe that his wife had been raped and had fantasies about killing the men who he believed had done it. The defendant reported to Borden that his wife ultimately admitted to him that she had been raped. Borden suspected, however, that the defendant had coerced her into making a false admission.

Shortly after his marriage, the defendant had begun work at Somers Thin Strip Company. He worked there until 1985, when the company reorganized and he lost his job. The defendant stated to Borden that it was important to him to be a good husband, a good provider and a good parent, unlike his own father. When the defendant was laid off, he became depressed and started drinking heavily and taking pills. The relationship between him and his wife worsened.

On Mother's Day, 1986, the defendant and his wife had a fight over whether to visit his wife's mother or the grave of the defendant's mother. The defendant became very angry and challenged his wife to leave him. She did. Divorce proceedings were initiated in July, 1986, and were finalized in January, 1987.

During this period the defendant continued to become more depressed and to drink heavily. He also took the prescription drugs Desoxyn and Fiorinal. Desoxyn is an amphetamine with a potent stimulant effect. Borden testified that it was the worst medication that could have been prescribed for the defendant because it would have exacerbated his depression and

paranoia and could trigger violent behavior. He also testified that using the drug in combination with alcohol would be "like throwing gasoline" on a simmering fire.

Borden testified that the defendant reported to him that he was extremely depressed during the month of December, 1987. His birthday, the anniversary of his father's death and his wedding anniversary all occurred in that month. It would have been his twentieth wedding anniversary that year.

The defendant had numerous contacts with his former wife beginning on or about December 9, 1987. He brought roses to her place of work, purchased a favorite wine for her, handled a motor vehicle registration problem, brought suitcases to her house for a trip to Florida that she had planned for herself and their son later in the month, hand-delivered a late child support payment and brought her a ring that she had requested. Borden testified that it was his belief that the defendant took these actions in hopes of reconciling with his former wife.

On December 12, 1987, the defendant went to his former wife's house in connection with one of these tasks. While there, he took her keys. That evening, the defendant went to a bar. He met a woman there, as we previously have noted, and took her back to his house, where he attempted unsuccessfully to have sexual intercourse with her. At some point, he took the woman home and then returned to his own house. He then noticed the keys that he had taken from his former wife's house and decided to return them to her and to try to talk to her. By then, it was very early in the morning of December 13.

Borden testified that his understanding of the events that happened next was based on an interview with the defendant on February 20, 1988. The defendant told him that, as he parked the car in the parking lot outside

his former wife's house, he thought that he saw someone walking around inside. He then "strapped on" a knife, went to the door and let himself in with the keys. The defendant reported to Borden that, at that time, he felt nervous, scared and unsure of himself. He laid the keys on an ironing board and then returned to the door, intending to leave. Instead, he went down into the basement. He did not know why. At some point, he went back up to the first floor and stood for a while. He then decided to go upstairs to his former wife's bedroom. The defendant reported to Borden that he still did not understand what he was doing. The defendant entered his former wife's bedroom, knelt on the bed and grabbed her. She screamed. The defendant reported to Borden that he just wanted to talk to her at that point, but was unable to speak. His former wife then yelled, "Bobby, call the cops, somebody is hurting me."

Borden testified that, at this point in the narrative given by the defendant during the interview on February 20, 1988, the defendant's demeanor changed dramatically. He began crying, sweating and trembling. In this agitated state, the defendant reported to Borden that he had been trying to keep his former wife from yelling, not trying to hurt her. He recalled pushing her face down, wrestling on the bed with her and falling onto the floor. He found himself sitting on top of her and hitting her to keep her from yelling. She continued to scream to "Bobby" that someone was trying to rape her.

At some point a light went on in the hall next to the bedroom. When the defendant looked up he saw someone standing in the doorway. The defendant did not know who it was. At that point, the defendant took the knife in his hand. Borden testified that the defendant's description of his feelings at that time were "very similar [to those that he had described having at the time of] the death of his father where he described himself recalling, seeing the hand, his hand and the

knife, not knowing what happened. . . . [I]t's like he didn't feel like he took the knife, he felt like his hand did it. It was a dissociative, it was not part of him."

The defendant reported to Borden that he did not recognize the person in the doorway. He said to his former wife that it was not "Bobby," but she said that it was. The person in the doorway then said something to the defendant. The defendant reported to Borden that he believed that the words were, "Dad, I love you." At that point, the defendant saw his own arm go out and hit the person in the doorway. He could not clearly see the person he was striking because the light was behind that person.

Borden testified that, during this part of the defendant's narrative to him, the defendant was extremely emotional, trembling and crying and appeared to be racked and tormented by his recollection. Borden testified that it was his impression that the defendant was "back in that room" as he reported the events. The defendant reported that he hit the person in the doorway and saw something gushing out of his neck or head and heard something gasping and gurgling. At that point, the defendant recognized his son.

The defendant then heard his former wife calling him and he returned to the bedroom. She asked the defendant, "[W]hy, Bob?" The defendant then grabbed her hair and felt his hand hit her. He heard gurgling and then a crash. He left the bedroom and, as he started down the stairs, saw his son lying at the bottom of the stairs on the floor, shaking. At that point, he went back into the bedroom and knelt next to his former wife, who was lying on the floor and asked, "[W]hy, why." He told her that he just wanted to talk, but then he hit her with his hand again.

Borden testified that, at this point in the interview, the defendant said, in reference to what happened next,

"God, no, no, no, I didn't do that." The defendant reported that he left the bedroom and went back downstairs. His son was lying dead at the bottom of the stairs with his eyes open and looking at the defendant. The defendant said to his son, "[T]hank you for the birthday card," and then stabbed him in the neck.

Borden testified that, while the defendant was reporting this portion of the narrative, he was saying, "[W]hy do I remember so much? Why do I have to remember?" and "[W]hy, why, why." He also continued to cry and to be in an extreme emotional state. After describing his last act, however, his demeanor changed instantaneously, as if he had awoken from a nightmare. Borden testified that he could never persuade the defendant to talk about the events surrounding the murders again. He testified that the defendant's demeanor during the interview indicated agony and remorse.

During subsequent interviews, the defendant continued to report to Borden that he felt that his hand was not part of him and that it was his hand that had done these things, not him. He indicated that he wished that he could have cut it off. He also indicated that, for years, he had believed that his grandmother might have killed his father. Borden testified that the defendant's experience of his hand as not being a part of himself was an example of the depersonalization that borderline personalities are prone to experience. Borden also testified that depersonalization is a defense mechanism developed by children who have been subjected to chronic severe abuse. As adults, such persons are prone to go into a dissociative state under severe stress.

Borden testified that, in his opinion, at the time of the offense, the defendant's ability to conform his conduct to the requirements of the law was significantly impaired; his mental functioning was significantly impaired; he suffered from a mental disease or defect,

namely borderline personality disorder; and he was severely mentally ill. He also testified that the defendant suffered from an extreme emotional disturbance at the time of the offense. Finally, he testified that the abuse suffered by the defendant during his childhood was some of the worst that he had ever seen and that, if the abuse were to occur in a family today, it would cause the child to be removed from the home immediately on an emergency basis.

## II

## CLAIMS RELATED TO NEWLY DISCOVERED EVIDENCE

We next consider the defendant's claim that the trial court improperly refused to grant a continuance to allow him to introduce testimony by his expert witness, based on newly discovered evidence, namely, two transcripts of legal proceedings pertaining to the 1966 killing of the defendant's father, that would have bolstered the expert's previous testimony and supported the unconsidered mitigating factor that the defendant had a mental impairment at the time that he killed his father. The defendant originally claimed in his brief to this court that the newly discovered evidence established that the defendant was insane at the time that he murdered his former wife and son. At oral argument before this court, however, the defendant withdrew this claim. The defendant also withdrew his claim that the state improperly failed to disclose in a timely manner the allegedly exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Although these last two claims have been withdrawn, we consider all of the claims together in order to provide context for the defendant's withdrawal of the two claims and our review of the remaining claim that the trial court improperly denied his motion for a continuance. We conclude that the trial court did not abuse

its discretion in denying the defendant's motion for a continuance.

The following additional facts and procedural history are relevant to the defendant's claim. On Wednesday, April 16, 1997, during the second penalty phase hearing, the state's attorney asked Borden on cross-examination whether he would change his opinion as to the defendant's mental condition if he knew that: (1) the defendant's grandmother had testified at the December 12, 1966 inquest into the death of the defendant's father that the defendant had taken a knife into the bathroom when escaping from his father and had come out with the knife in his hand and attacked his father; and (2) the defendant had testified at the inquest that his father had hit him only once during the entire time that they had lived together.[17] Borden responded that it would not. At that point, counsel for the defendant asked for and was provided with a copy of the transcript of the inquest proceeding.

On the morning of April 17, 1997, counsel for the defendant asked the state's attorney whether there were any other transcripts pertaining to the events surrounding the death of the defendant's father. In response to this request, the state's attorney provided

---

[17] The state's attorney indicated to Borden that the defendant had testified at the inquest that his father had hit him only once during the entire time they lived together. This representation apparently was based on the following exchange at the inquest:

"[Frank Healy, Jr., coroner for New Haven county at Waterbury]: Had [your father] ever hit you before?

"[The Defendant]: Oh, yes, sir.

"Q. When was the last time?

"A. Well, this is during the summer, sir.

"Q. During the summer of 1966?

"A. Yes, sir, he swung at me a couple of times.

"Q. Pardon?

"A. He swung at me a couple of times and hit me once.

"Q. He hit you once?

"A. Yes, sir."

defense counsel with a copy of the transcript of the December 3, 1966 examination of the defendant and other witnesses by county detective Thomas F. Laden, which had occurred within hours of the killing. Over the weekend of April 19 and 20, 1997, defense counsel examined the two transcripts that had been provided by the state (1966 transcripts) and concluded that the testimony contained therein raised new issues about the defendant's mental state that required Borden's expertise to evaluate.

The sentencing phase hearing reconvened on Tuesday, April 22, 1997. At the end of the morning session, defense counsel rested his case. At that time, he renewed a prior motion to impose a life sentence on the basis of the insufficiency of the aggravating factor. The motion was denied. He then moved to impose a life sentence on the basis of the state's failure to disclose exculpatory evidence, namely, the 1966 transcripts. Defense counsel also requested a two to three week continuance to allow the defense experts to review the transcripts and to prepare a supplemental report. He indicated that he needed the continuance "to simply have the experts review the materials of our investigation, review it and see—we're finding out in reviewing it that other people exist. That's where some of these people came from. There may be other people out there that can corroborate the doctor's opinion." He also stated that "[o]ver the weekend and yesterday in preparation for argument I was preparing to argue from the transcript to show the corroboration for Dr. Borden and in our family history background evidence and it occurred to me that if this was not in evidence for the jury to consider in the last trial then when you look if anyone has the opportunity to ever look and I have at the closing argument from the last trial and the transcript from the last trial this never came up and it's critical and it's crucial." Finally, defense counsel stated

that the counsel who had represented the defendant at the guilt phase and first penalty hearing had indicated that "he never knew about [the 1966 transcripts]. If he did he certainly would have put [them] into evidence. He certainly would have put [them] because [they do] corroborate . . . ." Defense counsel also indicated that he had waited until after the close of evidence to make the request because, if the court had granted his motion to impose a life sentence, then the request for a continuance would have been moot.

The panel denied both the motion for life sentence and the request for a continuance, stating that the 1966 transcripts would have no effect on the conclusions or testimony of the experts other than to corroborate them, that the panel now had the transcripts before it as exhibits, and that there had been neither a claim of prejudice nor a request for a continuance until after the conclusion of evidence. The panel then proceeded to hear closing arguments and, as previously noted in this opinion, ultimately imposed the death sentence.

On January 26, 1998, the defendant filed this appeal. On May 14, 1999, the defendant filed a petition for a new trial of both the guilt phase and the penalty phase of the prosecution on the basis of the newly discovered transcripts. In that petition, the defendant represented that Borden recently had reviewed the transcripts and had concluded in a written report dated March 9, 1999[18] (March 9, 1999 report), attached as exhibit A to the petition, that, "[i]f [the] documents had been available at the time of the examination [of the defendant] in 1988 . . . my diagnosis would have included a significant dissociated mental state which in my opinion would have rendered [the defendant] unable to appreciate the

_____
[18] The first page of this report carries the date March 9, 1999. Subsequent pages carry the date March 6, 1999. The date of the report is referred to inconsistently throughout the record. For purposes of clarity and consistency, we refer to it in this opinion as the March 9, 1999 report.

nature of his behavior and unable to conform his conduct to the requirements of the law at the time of the [murders of his former wife] and son." Borden's report also stated that the 1966 transcripts "clearly indicate that at the time of the death of his father, [the defendant] was in a dissociated mental state characterized by the sudden alteration in consciousness, making him unaware of his actions."[19] The defendant argued in his petition that the March 9, 1999 report constituted newly discovered evidence that was likely to produce a different result in new trials on both the guilt phase and the penalty phase of the prosecution.

Oral argument in the defendant's direct appeal was held before this court on January 8, 2002. At that argument, this court asked counsel for the defendant and counsel for the state why the court should not continue the appeal proceedings and order an immediate hearing on the petition for a new trial. Counsel for the defendant argued that this court should continue the appeal pro-

---

[19] Borden did not specify the portions of the transcripts that he believed supported his revised opinion. The defendant represented in his brief, however, that Borden had relied on the portions of the transcripts indicating that, immediately after the killing, the defendant could not remember how it happened. Specifically, the defendant pointed to his testimony at the December 3, 1966 examination conducted by detective Laden that, as his father approached him, he saw a knife and that, "[a]s far as I know, I [picked it up] . . . . I must have picked up the knife . . . the first thing I knew it was in my hand and he was on the floor. . . . All I remember, sir, is the knife in my hand. The first thing I remember my father was on the ground." Detective Salvatore Lovallo, who had investigated the killing, testified at the inquest that the defendant had told him that "his father . . . advanced towards him with his arms raised, his fists closed, indicating he wanted to strike him. He said he warded off one of the blows his father swung at him with his left hand. The next thing he realized there was a knife in his hand. I asked him did he remember picking up the knife, he said no, just he remembered the knife being in his hand with a downward motion he thrust it [in] the father's chest."

The defendant testified at the December 12, 1966 inquest that "[w]hen I turned around to see who broke the window I noticed, as I turned my head back around, I seen him step back and fall and I seen the knife in my hand and there was blood on it."

ceedings because the record on appeal did not contain a crucial factual underpinning of the defendant's claims pertaining to new evidence, namely, Borden's expected testimony concerning the 1966 transcripts. The state argued that the court should not order a continuance because the record was adequate to resolve the issues on appeal. At the conclusion of the argument, this court, under its supervisory powers, ordered that the appeal proceedings be continued and remanded the matter to the trial court so that the petition for a new trial could be heard on an expedited basis.

After the commencement of the proceedings on the petition for a new trial, counsel for the defendant met with Borden to prepare him to testify at those proceedings. At that meeting, Borden indicated that, despite his statements in the March 9, 1999 report, he would not testify that, on the basis of his review of the 1966 transcripts, he had an opinion that differed from the opinion he had offered during the second penalty phase hearing. Rather, he indicated that the transcripts merely raised new questions about the defendant's mental state at the time of the offense and that further testing would be necessary in order to determine whether the defendant had been insane at the time.

At a May 9, 2002 hearing on the petition for a new trial, counsel for the defendant reported this development to the trial court. He indicated that he did not believe that Borden's testimony would support the petition for a new trial. He also requested a continuance so that supplemental psychological testing of the defendant could be conducted to determine whether there was a valid basis for the petition. The trial court denied the request. The state immediately moved to dismiss the petition for new trial with prejudice. Before the trial court ruled on that motion, however, the defendant withdrew his petition with prejudice.

In light of these developments at the proceedings on the petition for a new trial, at oral argument before this court on this appeal, the defendant withdrew his claim that the panel improperly had refused to grant a continuance so that he could introduce testimony by Borden that the 1966 transcripts established that the defendant was insane at the time of the murders of his former wife and son. He also conceded that the record on appeal was inadequate for review of his claim under *Brady* v. *Maryland*, supra, 373 U.S. 83, and, accordingly, withdrew that claim.[20] The defendant claimed, however, that the panel should have granted a continuance so that the defendant could introduce additional testimony by Borden that the 1966 transcripts: (1) corroborated rather than impeached Borden's prior testimony in support of the defendant's claimed mitigating factor that he suffered from a mental impairment at the time of the offense; and (2) established that the defendant was in a dissociative state at the time that he killed his father, thereby establishing, as an additional mitigating factor not previously claimed, that the defendant had suffered from a mental impairment from the time of his father's death.

Thus, as the defendant has framed his claim, he implicitly suggests that his theories as to the nature and materiality of Borden's prospective testimony, as

---

[20] "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 736–37, 756 A.2d 799 (2000). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) Id., 744. The defendant conceded that the record in this case is inadequate for review of his *Brady* claim because the record does not contain expert testimony about the 1966 transcripts and, therefore, this court cannot determine whether that testimony would be material.

those theories were developed following the trial, are relevant to our review of the panel's ruling on his request for a continuance.[21] We disagree. Theories about the nature and materiality of the allegedly nondisclosed evidence that were developed by the defendant *after* the close of trial are relevant only to the defendant's withdrawn petition for a new trial and his abandoned *Brady* claim. Our review of the panel's denial of the defendant's motion for continuance is limited to a determination of whether the panel, *on the basis of the record before it at the time that the defendant moved for a continuance,* abused its discretion in ruling as it did. See *State* v. *Brown,* 242 Conn. 445, 458, 700 A.2d 1089 (1997) ("an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance" [internal quotation marks omitted]). We conclude that it did not.

As a preliminary matter we address the standard of review. We previously have recognized that "[t]he determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen

---

[21] This suggestion places the defendant in somewhat of a quandary. If we were to agree with him that evidentiary theories developed following the trial are relevant to our review of the panel's ruling on the defendant's motion for a continuance, then we would have to conclude that the defendant's claim is not reviewable, because the factual record is not adequate for consideration of those theories. Because we conclude, however, that the panel's ruling must be reviewed on the basis of the record before it at the time that it ruled, we conclude that the claim is reviewable.

one of many reasonable alternatives. . . . Therefore, on appeal, we . . . must determine whether the trial court's decision denying the request for a continuance was arbitrary or unreasonabl[e]." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 711, 805 A.2d 705 (2002).

The defendant argues, however, that the eighth and fourteenth amendments to the United States constitution, article first, §§ 8 and 9, of the Connecticut constitution and General Statutes (Rev. to 1995) § 53a-46a (c) and (d)[22] require us to apply a less deferential standard of review to the denial of a request for a continuance to introduce additional mitigating evidence in a death penalty case than we apply to other evidentiary claims, including evidentiary claims of constitutional magnitude. In effect, the defendant argues that the trial court must grant any request to present evidence that the defendant claims to be mitigating, regardless of the timing or persuasiveness of the request. We disagree. The cases relied on by the defendant in support of his constitutional claim indicate only that, under the eighth and fourteenth amendments, the sentencer in a death penalty case must consider any and all relevant mitigating evidence. See *Penry* v. *Lynaugh*, 492 U.S. 302, 317, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (eighth and fourteenth amendments require that sentencer not be precluded from considering "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of a defendants' character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" [emphasis in original; internal quotation marks omitted]); *Eddings* v. *Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (same); *Lockett* v. *Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed.

---

[22] See footnote 3 of this opinion for the text of General Statutes (Rev. to 1995) § 53a-46a.

2d 973 (1978) (plurality opinion) (same). Likewise, the relevant provisions of § 53a-46a provide only that any mitigating evidence "concerning the defendant's character, background and history, or the nature and circumstances of the crime"; General Statutes (Rev. to 1995) § 53a-46a (b); may be presented to the sentencer, "regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters . . . ." General Statutes (Rev. to 1995) § 53a-46a (c). Nothing in any of these authorities requires a trial court, in ruling on a defendant's motion for a continuance to introduce purportedly new mitigating evidence at some future date, to *assume* that any and all such evidence will, in fact, be mitigating, and not merely cumulative, in the absence of any credible claim to that effect. To conclude otherwise would be to grant defendants the unfettered ability continually to extend a penalty phase hearing by repeatedly making unsupported claims that they would be able, at some future time, to introduce new mitigating evidence.

We now turn to the merits of the defendant's claim. We have recognized that the factors to be considered by a trial court in ruling on a motion for a continuance include "the likely length of the delay . . . the impact of delay on the litigants, witnesses, opposing counsel and the court . . . the perceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 261 Conn. 714. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Internal quotation marks omitted.) Id. Finally, we have recognized that "a trial court does

not act arbitrarily or unreasonably when it denies a motion for a continuance that is supported by mere speculation." Id., 714–15.

In *Delgado*, we reviewed a claim by the defendant that the trial court improperly had denied his request for a thirty day continuance in order to respond to new evidence presented by the state during the course of the trial. Id., 709–10. The defendant had been charged with sexual assault and the new evidence consisted of a medical report indicating that the victim had experienced dreams involving violence and sex. Id., 711–12. When questioned by the trial court as to the purpose of the continuance, defense counsel responded " 'I'm not sure I am—other than to protect my client's interest . . . .' " Id., 712. The trial court denied the request and the Appellate Court affirmed the denial. Id., 713–14. Thereafter, we granted the defendant's petition for certification to appeal to this court. *State* v. *Delgado*, 258 Conn. 913, 728 A.2d 1248 (2001).

On appeal, we determined that the reasons proffered by defense counsel in support of the motion for continuance were merely speculative. *State* v. *Delgado*, supra, 261 Conn. 715–16. Accordingly, we concluded that the trial court had not abused its discretion in denying the motion. Id., 717; see also *State* v. *Walker*, 215 Conn. 1, 11, 574 A.2d 188 (1990) (court did not abuse discretion in denying untimely request for continuance to photograph crime scene and interview eyewitness where, "other than speculation on appeal, there is no reason to believe that the denial of the request impaired the defendant's ability to present a defense"); *State* v. *Aillon*, 202 Conn. 385, 395, 521 A.2d 555 (1987) (court did not abuse discretion in denying request for continuance where defendant "failed to make any evidentiary showing that [witness'] testimony would have aided the defense in any manner").

In this case, the reasons proffered by the defendant in support of his request for a continuance were that: (1) the transcripts previously had not been disclosed by the state;[23] (2) the transcripts were "critical and crucial" evidence; and (3) the defendant needed the additional time to review the transcripts and to arrange for additional expert testimony that would corroborate Borden's opinion. We agree with the defendant that, depending upon the circumstances, the state's untimely disclosure of evidence might provide a legitimate reason for granting a motion for a continuance. As a general matter, if the state fails to disclose "critical and crucial" evidence until late in the proceedings, a court reasonably could give weight to that fact in determining whether the defendant is entitled to additional time to evaluate the evidence. In this case, however, the 1966 transcripts, in and of themselves, were not self-evidently "critical and crucial" evidence, and the defendant did not explain to the court why he considered them to be so. Rather, he indicated only that the transcripts could provide the basis for additional testimony that would merely corroborate Borden's previous opinion testimony. The panel reasonably could have concluded that such testimony would be merely cumulative of prior testimony and of the transcripts themselves, which had been admitted into evidence, and, accordingly, that the marginal probative value of the testimony, if any, did not justify the requested delay. Moreover, even if it is assumed, that, long after the close of the second penalty phase hearing, the defendant discovered that the transcripts provided the basis for a radically new defense theory, such a development would have

[23] The state vigorously denied both to the panel and to this court that it had not disclosed the transcripts to the defendant prior to the second penalty phase hearing. We need not decide that question, however, in light of our conclusion that, even if it is assumed that the state had not disclosed the transcripts, on the basis of the record before it, the panel did not abuse its discretion in denying the motion for continuance.

been merely speculative at the time that the panel ruled on the motion for a continuance. Indeed, as the defendant has conceded, the full significance of the 1966 transcripts is still speculative today. Accordingly, we conclude that the panel did not abuse its discretion in denying the motion for a continuance. See *State* v. *Delgado*, supra, 261 Conn. 715–16 (trial court did not abuse discretion in denying motion for continuance when significance of evidence was merely speculative); see also *State* v. *Watley*, 195 Conn. 485, 490, 488 A.2d 1245 (1985) (court has discretion to exclude corroborative evidence that is merely cumulative). We emphasize that we need not decide in this case whether Borden's testimony on the newly discovered 1966 transcripts would, in fact, have done more than corroborate the extensive testimony already before the panel. We conclude only that, on the basis of the record before it, the panel reasonably could have concluded that it would not.

Moreover, we note that, although the defendant obtained the 1966 transcripts during the course of presenting his case, for tactical reasons, he did not request the continuance until after he had rested his case. We previously have recognized that "[i]f the trial court finds that inadvertence or some other compelling circumstance . . . justifies a reopening and no substantial prejudice will occur, it is vested with the discretion to reopen the case. . . . In order for the trial court's exclusion of the proffered evidence to constitute a sixth amendment violation, however, [i]t must be shown . . . that the . . . evidence was of such importance to the achievement of a just result that the need for admitting it overrides the presumption favoring enforcement of the state's usual trial procedures. . . . A greater prejudice must be shown by the omission of the evidence in question than in refusals to receive evidence offered in the regular course of a trial." (Citations omitted;

internal quotation marks omitted.) *State* v. *Carter*, 228 Conn. 412, 421, 636 A.2d 821 (1994). Thus, the standard for granting a continuance to present additional evidence after the close of evidence is stricter than the standard applied in the course of a trial. This further bolsters our conclusion that the panel did not abuse its discretion in denying the motion for continuance.

The defendant argues, however, that the standard for determining whether mitigating evidence in death penalty cases is excludable as cumulative is more lenient to the defendant than the standard applied in other contexts. In support of this claim, he relies on *Skipper* v. *South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986), and *State* v. *Ross*, 230 Conn. 183, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995). In *Skipper*, the United States Supreme Court reviewed a claim that the trial court improperly had excluded the testimony of two jailers and a regular visitor to the jail to the effect that the defendant "had 'made a good adjustment' " to prison life. *Skipper* v. *South Carolina*, supra, 3. The trial court had concluded that the ability of the defendant to adjust was excludable as irrelevant, and the Supreme Court of South Carolina had affirmed that determination. Id. On the defendant's appeal to the United States Supreme Court, the state argued in part that the evidence was properly excluded because it was merely cumulative of testimony by the defendant and his former wife that his conduct in jail was satisfactory and that the defendant would not cause trouble in the future. Id., 7–8. The Supreme Court reversed the judgment of the South Carolina Supreme Court, concluding that "characterizing the excluded evidence as cumulative . . . is implausible on the facts before us." Id., 8. Specifically, the court concluded that the testimony of the jailers would have been given much greater weight by the jurors than the self-serving testimony that the defen-

dant had been allowed to present. Id. The court also concluded that it was reasonably likely that the exclusion of the evidence might have affected the jury's decision to impose the death sentence. Id. This standard is akin to the harmless error standard that we have applied to erroneous evidentiary rulings involving constitutional violations. See *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001) (when exclusion of evidence implicates constitutional right, error requires new trial "only if the exclusion of the proffered evidence is not harmless beyond a reasonable doubt" [internal quotation marks omitted]); id. ("[i]f the evidence may have had a tendency to influence the judgment of the jury, [its exclusion] cannot be considered harmless" [internal quotation marks omitted]).

In *Ross*, the other case relied upon by the defendant, this court reviewed a claim that the trial court improperly had excluded both a letter from a court-appointed psychiatric expert who had evaluated the defendant for the state, which reflected the fact that the expert had changed his position about the mitigating role of the defendant's psychopathology, and a report by the same expert that corroborated the diagnosis of the defendant contained in the reports of defense experts. *State* v. *Ross*, supra, 230 Conn. 266–67. On appeal, the state argued that the evidence properly had been excluded because it was unauthenticated hearsay and unreliable. Id., 267–68. After concluding that relevant mitigating evidence is admissible even if its reliability cannot be tested by the state, this court determined that the excluded report "corroborated the defense psychiatric experts' opinions that the defendant suffered from sexual sadism." Id., 272. We also determined that the report "could have appeared more objective and worthy of belief than evidence adduced by the defendant from his own expert witnesses." Id. Finally, we concluded that, because the excluded evidence was "unique" and

was "more likely than not to have affected the result of the sentencing hearing," its exclusion was improper. Id., 273, citing *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991), and *State* v. *Jones*, 205 Conn. 723, 732, 535 A.2d 808 (1988). We typically have applied this "more likely than not" harmless error standard to claims of nonconstitutional evidentiary error. See *State* v. *Tatum*, supra, 738 (when claimed evidentiary error does not implicate constitutional right burden is on defendant to show that " 'it is more probable than not that the erroneous action of the court affected the result' "); *State* v. *Jones*, supra, 732 (same). "A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 364, 803 A.2d 267 (2002).

We conclude that, contrary to the defendant's claim, neither *Skipper* nor *Ross* applied a more lenient standard for determining whether evidence is cumulative than that applied in other contexts. Evidence that has much greater weight than evidence already introduced; see *Skipper* v. *South Carolina*, supra, 476 U.S. 8; or unique evidence; see *State* v. *Ross*, supra, 230 Conn. 273; is not cumulative in any context. In any event, we have concluded in this case that the panel's conclusion that the 1966 transcripts would have *no effect* on the conclusions or testimony of the experts other than to corroborate them was reasonable in light of the record before it and, therefore, its exclusion of the transcripts as cumulative was proper. Accordingly, even if it is assumed that *Skipper* stands for the proposition that the standard for determining whether evidence was properly excluded as cumulative in death penalty cases is whether the evidence might affect the sentencer's decision to impose the death sentence, that standard was met.

Finally, we note that the defendant in the present case was not left without a remedy for the state's alleged failure to produce the 1966 transcripts in a timely manner. If the defendant ultimately were to establish that they improperly were suppressed by the state and were material to his case, he could—as he, in fact, did—either raise a *Brady* claim or initiate collateral proceedings such as a petition for new trial.

## III

## CLAIM RELATING TO PROVED FACTUAL BASIS OF MITIGATING CLAIMS

The defendant next claims that the panel arbitrarily rejected as mitigating under the facts and circumstances of this case the defendant's proved factual claims that he: (1) was neglected, abandoned and the product of an abusive family unit during his childhood; (2) had been a model prisoner at all times since his incarceration for the murders; (3) dropped out of school at age sixteen; and (4) was a good employee and a productive worker. We disagree.

As a preliminary matter, we address the reviewability of this claim. The defendant concedes that he did not preserve the claim by moving to impose a life sentence on the ground that he had established a mitigating factor. He therefore seeks appellate review under the *Golding* doctrine; see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); the plain error rule; Practice Book § 60-5; and the "special capital reviewability rule."[24] Under *Golding*, a defendant may prevail on unpreserved claims "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right;

[24] We previously have held that no special capital reviewability rule exists in this state. See, e.g., *State* v. *Cobb*, 251 Conn. 285, 343–44 n.34, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

(3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 239–40. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

We conclude that the record is adequate for review and that, in view of the constitutional requirement under the eighth and fourteenth amendments that the death penalty not be "imposed by the fact finder in a wanton, freakish, aberrant, or wholly arbitrary and capricious manner"; *State* v. *Webb*, 238 Conn. 389, 500, 680 A.2d 147 (1996); the claim is of constitutional magnitude. Moreover, we note that the state has not argued that the claim is unreviewable and has briefed the claim on its merits. Accordingly, we will review the claim. We conclude, however, that the defendant cannot prevail under the third prong of *Golding*.

We begin our analysis by considering the appropriate standard of review. We previously have recognized that, "[u]nder our death penalty statute, the defendant must convince the jury not only of the facts underlying an alleged nonstatutory mitigating factor, but also that the factor 'is mitigating in nature, considering all the facts and circumstances of the case,' such that 'in fairness and mercy, [it] may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.' General Statutes § 53a-46a (d)." *Breton II*, supra, 235 Conn. 229. We also have recognized that, "[a]lthough our review of the evidence in mitigation of the death penalty is a heightened one

. . . we will not substitute our judgment or opinions for that of a reasonable [sentencer]. . . . Instead, we must determine whether the defendant's proof of a mitigating factor was so clear and so compelling that the [sentencer], in the exercise of reasoned judgment, could not have rejected it." (Citations omitted.) Id.

The defendant concedes that this standard of review applies to the panel's determination of the facts underlying his claimed mitigating factors. He claims, however, that the panel's determination of whether those facts are mitigating in nature is subject to de novo review and that this court must independently exercise its own normative moral judgment in considering that issue. The defendant makes the following two arguments in support of his claim: (1) plenary review of a sentencer's normative determination is required to enforce "the conscience of the community on the ultimate question of life or death"; *Witherspoon* v. *Illinois*, 391 U.S. 510, 519, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968); and (2) the need for and practicality of such review is demonstrated by the practice of other jurisdictions. We are not persuaded.

With respect to the defendant's first argument, we note that *Witherspoon* requires only that a state's death penalty scheme must be administered so as to ensure that the sentence of death reflects the conscience of the community.[25] We can perceive no reason that this

---

[25] The Supreme Court in *Witherspoon* reviewed a statute that permitted the state of Illinois to exclude from the sentencing jury venirepersons who expressed scruples against the death penalty and concluded that a jury from which such persons had been excluded could "speak only for a distinct and dwindling minority"; *Witherspoon* v. *Illinois*, supra, 391 U.S. 520; and "fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments." Id., 518. We have recognized that the standard for discharging prospective capital jurors established in *Witherspoon* "was abandoned and replaced by a more flexible standard in *Wainwright* v. *Witt*, [469 U.S. 412, 420, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)]." *State* v. *Webb*, supra, 238 Conn. 435. We assume for purposes of this appeal, however, that the constitutional concern expressed in *Witherspoon* that the death sentence reflect the conscience of the community remains vital.

court's independent moral judgment as to the mitigating nature of proved facts should more accurately reflect the conscience of the community than the reasoned moral judgment of the sentencer. Accordingly, we reject this argument.

With respect to the defendant's argument based on cases from other jurisdictions, we note that none of the cases cited by the defendant addresses the specific issue that he raises here or suggests that the review that he seeks is constitutionally required. Rather, the cases merely support the undisputed proposition that appellate review of a death sentence must be sufficiently rigorous to ensure that the death sentence is not excessive, disproportionate, wanton or freakish; see *Jurek* v. *Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976) (judicial review that "serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed" satisfies constitution); and indicate that the heightened review that he seeks may be one constitutionally adequate method of ensuring such a result. For example, in *State* v. *Watson*, 129 Ariz. 60, 63, 628 P.2d 943 (1981), the court concluded that "[t]he question before us is not whether the trial court properly imposed the death penalty, but whether, based upon the record before us, we believe that the death penalty should be imposed. A finding merely that the imposition of the death penalty by the trial court was 'factually supported' or 'justified by the evidence' is not the separate and independent judgment by this court that the death penalty warrants. This is in keeping with the mandate of the United States Supreme Court that we must review carefully and with consistency death penalty cases and not engage in a 'cursory' or 'rubber stamp' type of review. *Proffitt* v. *Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). The death penalty statute must not be applied freakishly or unevenly." Cf. *Terry* v. *State*, 668 So. 2d 954, 965 (Fla. 1996) ("[o]ur

proportionality review requires us to consider the totality of circumstances in a case, and to compare it with other capital cases" [internal quotation marks omitted]); *People* v. *Smith*, 177 Ill. 2d 53, 98, 685 N.E.2d 880 (1997) (reviewing court must "[vacate] death sentences where such an extreme penalty [is] found to be inappropriate, in view of any relevant mitigating factors"); *Bellmore* v. *State*, 602 N.E.2d 111, 129 (Ind. 1992) (reviewing court "may redetermine whether to impose the death sentence upon an independent reweighing of aggravating and mitigating circumstances to assure measured consistent application of the death penalty and assure fairness to the accused").

Contrary to the defendant's argument, none of these cases indicates that the constitutional requirement for a careful review of a death sentence to ensure that it is applied appropriately and consistently *necessarily* entails a de novo determination by the reviewing court as to whether facts proved by the defendant in support of claimed mitigating factors are mitigating in nature. Accordingly, we decline to revisit our previous conclusion that proportionality review pursuant to General Statutes (Rev. to 1995) § 53a-46b, in conjunction with our heightened review of the evidence of aggravation and mitigation; see *Breton II*, supra, 235 Conn. 228–29; provide a constitutionally adequate method of ensuring that the death penalty statute is not applied freakishly or unevenly. See *State* v. *Webb*, supra, 238 Conn. 494–505. We therefore reject the defendant's claim that the panel's determination that the facts proved by him in support of his claim of mitigation were not mitigating in nature should be subject to de novo review.

We conclude instead that the appropriate standard for our review of the sentencer's determination of whether proved facts are mitigating in nature is "whether the defendant's proof of a mitigating factor was so clear and so compelling that the [sentencer],

in the exercise of reasoned judgment, could not have rejected it." *Breton II*, supra, 235 Conn. 229. Nothing in *Breton II* suggests that this standard applies only to the sentencer's determination of the facts underlying an alleged mitigating factor, and not to its determination of whether those facts were mitigating. Indeed, in *State v. Cobb*, 251 Conn. 285, 491, 743 A.2d 1 (1999) (*Cobb II*), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000), we implicitly applied this standard in reviewing the sentencer's rejection of the mitigating nature of certain claimed mitigating facts. We concluded that, "even if we were to assume . . . that the evidence somehow established . . . the factual basis for his claim . . . that still would not *compel a conclusion* that the defendant, as a matter of law, proved the existence of mitigation." (Emphasis added.) Id., 492–93. Thus, we recognized in *Cobb II* that we would overturn the panel's finding that a proved fact was not mitigating only if the evidence compelled a conclusion that it was. Id. In our view, neither our death penalty statute nor the state or federal constitution requires a less deferential standard of review.

We now turn to a review of the defendant's evidence in support of mitigation. In addition to Borden's testimony, as previously summarized in this opinion, the defendant presented the testimony of a clinical psychologist, Anne M. Phillips, the defendant's sister, Catherine Bunker, his brother-in-law, John Bunker, his former coworkers, Robert Trumfio and Aurigemma, counsel supervisor for corrections, Anne Cournoyer, and correction officers Craig Bergeron, Todd Case, Carl Stelmack and Timothy John Carroll to establish his claimed mitigating factors.

Phillips testified that she subjected the defendant to a number of diagnostic tests and her diagnostic impression was that the defendant had a mixed personality disorder with paranoid, schizoid and depressive fea-

tures; personality disorder, in general, is a chronic disturbance of personality organization that causes significant distress and interferes with cognitive, social and emotional functioning; the defendant's disorder was characterized by a need for self-protection, a need to limit stimuli, a tendency to deny experiences that are disorganizing and that could cause him to behave impulsively or to be emotionally overwhelmed, and extremely limited psychological defenses; the defendant's mental capacity was significantly impaired; the defendant's personality disorder was chronic and had existed at least since young adulthood, although its severity could fluctuate over time; stressors such as job loss or the loss of an important relationship would increase the severity of the disorder; the defendant could function well in some environments, such as a work environment, in spite of his personality disorder; the defendant was not sociopathic, meaning that Phillips saw no ongoing pattern of his testing authority, behaving impulsively or being antisocial; December was a difficult month for the defendant because his birthday, his wedding anniversary and his father's death all occurred in that month; the defendant was a highly dependent person and his dependency was a result of his sense of having been threatened, neglected and abused by his parents as a child while less important figures, such as his grandmother and his teachers, although more helpful to him, failed to "save" him; the defendant's dependency was highly focused on his wife; and divorce would have been "more than usually disorganizing" for the defendant.

The defendant's sister, Catherine Bunker, testified that she was four years younger than the defendant; their grandmother, Eva Breton, told her that the defendant had been sent to an orphanage when he was about one year old and had been very badly abused there; the home in which she and the defendant were raised was

characterized by severe alcoholism and abuse; their father never worked and drank every day; their parents separated when the defendant was nine years old; their mother lived with another man after the separation; the family had little money and she and the defendant were forced to wear old and ill-fitting clothes; their mother frequently left the house in the middle of the night and on occasion would come back scratched and bloody; their mother brutally strangled and dismembered a pet cat and left the remains around her bedroom; at one time, their mother bought a turkey for Thanksgiving dinner but then got drunk and left the turkey in a pot of water on the stove for days; their parents would have raucous strip poker parties during which they would sedate the children with paregoric to keep them asleep; their mother would try to leap out of moving cars in an attempt to kill herself; their mother would put her head in the oven and pretend that she was dead; the defendant was struck and injured by a pickup truck when he was about ten years old; the defendant ran away from home at one point; when the police picked him up and returned him, their mother was drunk and the police found "at least a hundred" empty liquor bottles under her bed; the defendant broke into a neighbor's apartment and deliberately left a trail of baby powder so that the police would find him and remove him from his home; after the defendant moved in with their grandmother and father, their father was physically abusive to him; their father repeatedly threatened to kill the defendant; the defendant was extremely upset about his breakup with his wife and sought psychological treatment for depression; the defendant received prescription medicines that he took with alcohol; on December 14, 1987, the day after the murders, Catherine Bunker told an investigator that the defendant had filled a thirty day prescription on December 9, and that almost all of the pills were already gone; and the defendant

was very irritated and erratic around the time of the murders.

The defendant's brother-in-law, John Bunker, testified that he met the defendant when the defendant was still married to his wife; the defendant seemed to be easygoing and an "[o]utstanding citizen"; after the defendant separated from his wife, he became depressed and holidays became difficult for him; the defendant lost weight after the separation; the defendant drank after the separation; and he had heard that the defendant had had a bad childhood.

Trumfio testified that he was an employee at Somers Thin Strip Company, where the defendant worked; the defendant was hired in an entry level position in 1968 and was promoted to foreman in 1978 on the basis of his good work performance; the defendant supervised thirty-five to forty people as foreman; the defendant left the company in 1985 when the company was required to downsize and offered him the choice of being laid off or returning to an entry level position; the defendant was rehired in 1987 because he had been a productive and industrious worker; Trumfio noticed at that time that the defendant was more withdrawn than he previously had been; and the defendant never had any disciplinary reports against him, showed up for work regularly and fulfilled his daily work requirements.

Aurigemma testified that he was a former employee of Somers Thin Strip Company; he has known the defendant for over twenty years and considered himself to be the defendant's best friend and probably his only friend; at some point in 1987 the defendant came to his house appearing thin, drawn, weary and worn out, and told Aurigemma that he was getting a divorce; the defendant at that time was depressed and had lost his ambition; and the defendant, after his separation from his

wife, would lie on a couch in his apartment, stare at a photograph of his wife and cry.

Bergeron testified that he was a correction officer at Osborn correctional institution for several years when the defendant was also there; the defendant caused no trouble as an inmate; and the defendant was the only prisoner on death row who was allowed the privilege of being a "tier man," or the person responsible for keeping the unit clean. Cournoyer testified that she was the defendant's treatment counselor at Somers prison during 1994 and 1995 and found the defendant to be trustworthy, respectful, quiet and cooperative. Case testified that he was a correction officer at Northern correctional institution and that he has known the defendant for approximately two and one-half years; he found the defendant to be quiet, cooperative, respectful, trustworthy and a model prisoner; and other prisoners on death row have assaulted each other and have been disrespectful to the officers. Stelmack testified that he was a correction officer at Northern correctional institution and that he has known the defendant for about two years; to his knowledge, the defendant has never caused any trouble in prison; the defendant works as a cashier and as a "tier man" for a wage of about eighty cents per day; and the defendant has had no disciplinary tickets during the entire period of his incarceration. Carroll testified that he was a correction officer at Northern correctional institution, that he has known the defendant since 1989 and that the defendant is quiet, cooperative, respectful, nondemanding and trustworthy.

The defendant also introduced as exhibits at the second penalty phase hearing the transcripts of the testimony given at the first penalty phase hearing by correction officers Christopher Pelkey and Edward Zelek and by Borden. The testimony of Pelkey and Zelek was substantially similar to the testimony of the correc-

tion officers at the second hearing. The testimony given by the defendant's aunt, Ruth Breton,[26] at the first hearing was read in to the record at the second hearing.[27]

The state relied solely on its cross-examination of the defendant's witnesses to rebut the defendant's mitigating evidence. Borden testified on cross-examination that he had obtained the defendant's family background information primarily from interviews with the defendant's sister and aunt, not from the defendant himself; he assumed that the defendant's sister did not want him to be sentenced to death; his interviews of the sister and aunt lasted approximately one hour each; he assumed that they knew that he was acting at the request of the defendant's attorneys; he had obtained the information about the defendant's being placed in an orphanage from Ruth Breton and that he did not know how long the defendant had been placed there; he had obtained information about the strip poker games from Ruth Breton, not from the defendant, and he could not recall if she indicated whether the defendant had been present; he had obtained the information about the dismemberment of the family cat from Catherine Breton, not from the defendant; neither the defendant nor his family members told Borden about his arrest for breaking into his former wife's house in July, 1986; July, 1986, was an especially bad month for the defendant because his divorce proceedings had been initiated that month; although Borden was interested

---

[26] By the time of the second penalty phase hearing, Ruth Breton had died.

[27] Ruth Breton's testimony was summarized in *Breton II*, supra, 235 Conn. 231, as follows: "[T]he defendant's mother had placed him in an orphanage when he was a little more than one year old, and when he returned to the family home at age four, he appeared to have 'been terribly abused' and was frightened and withdrawn; his parents, who separated when he was nine years old, were alcoholics who openly engaged in deviant sexual behavior in their home; his mother punished him by whipping him with a belt; his mother once killed a pet cat and carved it into pieces; and his father was preoccupied with knives and killing, and had threatened to kill the defendant."

in what the defendant's life was like between the ages of twenty and forty, when he committed the murders, he did not interview any of the defendant's friends or coworkers about that period; he had obtained the information about the defendant's mother's beating him from Ruth Breton and Catherine Bunker, not from the defendant, and he did not know if they witnessed the beatings; he had obtained the information about the defendant's mother's prostitution from Ruth Breton, not from the defendant; at the time that he prepared his psychological evaluation of the defendant, he had not read the statements of the persons who were with the defendant on the dates immediately preceding and following the murders; he did not know whether there was any factual basis to the defendant's apparently paranoid beliefs about his wife's having affairs during their marriage or after the divorce; and, at the time that he made his psychological evaluation, Borden had not read the defendant's statement to the police in which the defendant denied having been involved in the murders and it would not change his opinion.

Phillips testified on cross-examination that her psychological evaluation of the defendant was based on five tests and two interviews of the defendant; the interviews lasted approximately one and one-half hours combined;[28] the intelligence test administered to the defendant did not indicate that he was suffering from any mental illness; the defendant was aware that Phillips was going to testify about the test results and interviews in court; it was not surprising that the defendant was withdrawn and remote given his circumstances and the charges pending against him; the defendant told Phillips that he felt that he had been unfairly incarcerated, did not trust his attorneys or the legal system and

---

[28] Phillips also conceded on cross-examination that she had testified at the first penalty phase hearing that the interviews lasted approximately forty-five minutes combined. See *Breton II*, supra, 235 Conn. 232.

was resigned to a bad outcome; the defendant insisted that he knew nothing about the deaths of his son and former wife; the defendant was well-spoken, self-contained, calm and polite; the defendant spoke of his son with affection and evident distress; the defendant did not indicate to Phillips that his father had been an alcoholic who abused him; Phillips was not aware at the time that she evaluated the defendant that he had threatened to kill his wife in September, 1986, and that fact would not have changed her evaluation of him; the defendant told Phillips that his wife had obtained a restraining order against him in order to make the separation "more legal" and did not report that he had been harassing his former wife by calling and following her; Phillips would expect a person in the defendant's position, i.e., incarcerated and awaiting trial on charges of capital felony involving the murder of his former wife and son, to be depressed and discouraged, but not necessarily fatalistic; and the defendant never took responsibility for the deaths of his wife and son.

Catherine Bunker acknowledged on cross-examination that her grandmother, Eva Breton, had told her about the strip poker games but that she had not told her that she, Eva, was present at the games; she did not know if the defendant ever learned about the incident with the pet cat; their grandmother was a very kind, gentle and loving woman who showed a great deal of affection for both Catherine and the defendant as they were growing up; the defendant dropped out of school when he was sixteen; the defendant had friends during his teenage years; she had never heard of the defendant's having trouble with people at his workplace; the defendant's wife obtained a restraining order against the defendant after their separation; the defendant had started seeing a psychologist under court order; she was not aware that the defendant had been arrested for breaking into his wife's house after the

separation, but had heard that he had been found hiding under a blanket in a closet in the house; the defendant had called her on the morning of the murders and said that he needed a ride; when she picked him up, he sat in the backseat of her car whistling and singing; and the defendant drank on weekends but was not an alcoholic.

Catherine's husband, John Bunker, testified on cross-examination that, before the defendant's separation from his wife, he seemed to be a "regular guy" who worked full time and socialized with people and that there was nothing bizarre or abnormal about his behavior. Trumfio also acknowledged on cross-examination that he had never observed any bizarre or strange behavior by the defendant that would suggest that he required psychological help.

Aurigemma testified on cross-examination that he and his family were very close to the defendant and that he had never noticed any signs of mental instability in him; on the evening of December 13, 1987, after the defendant had committed the murders, he called Aurigemma and said that he needed his help to get his truck, which was stuck at the reservoir in Thomaston; the next day, the defendant went to Aurigemma's house and together they then went to a coffee shop; while there, the defendant indicated that he had been trying unsuccessfully to reach his former wife, that he was worried that a man that she had been seeing may have tried to hurt her and that he wanted to check on her; they drove to the apartment where the defendant's former wife lived and the defendant noticed blood on the doorknob; the defendant called the police, who came to the apartment and found the victims' bodies; and, at that point, the defendant became visibly upset.

The defendant claims that, in light of this evidence, it was arbitrary for the panel to reject the mitigating nature of the proved facts that the defendant was

neglected, abandoned and the product of an abusive family unit during his childhood; has been a model prisoner at all times since his incarceration for the murders; dropped out of school at age sixteen; and was a good employee and a productive worker. We conclude, however, that the evidence presented did not compel a finding that these facts "extenuate[d] or reduce[d] the degree of [the defendant's] culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death." General Statutes (Rev. to 1995) § 53a-46a (d). Rather, the panel reasonably could have concluded that, although the evidence established that the defendant had been abused and neglected as a child, he also had received love and support from his sister, his grandmother and his teachers, and that the abuse that he suffered as a child had not prevented him from perceiving and pursuing a better way as an adult. The panel also reasonably could have considered the fact that the reports of abuse and neglect were from persons who had an interest in exaggerating the severity of the abusive conduct and its effect on the defendant. Finally, we conclude that it is not inconsistent or arbitrary for a sentencer to acknowledge, and even to have compassion for, a defendant's past suffering and, nevertheless, to conclude that that suffering does not mitigate the commission of a horrific offense. See *Cobb II*, supra, 251 Conn. 492–93 (whether particular fact is mitigating properly is determined in light of all facts and circumstances of case, including nature of crime). Put another way, in considering whether certain proved facts are mitigating, the pertinent question is not whether the defendant has established some general ground for sympathy, but whether he has established a reason to hold him less than fully responsible for the conduct with which he is charged. Cf. id., 495–96 ("§ 53a-46a does not require a capital sentencer to give mitigating force to any particular

proven factor solely because that factor establishes 'something good' about the defendant"). In the present case, the panel reasonably could have concluded that the defendant's abuse as a child did not constitute such a reason.

It is also clear that the panel was not compelled to conclude that the defendant's dropping out of high school, in and of itself, was mitigating. There was no evidence that that decision was forced upon the defendant or resulted in any long-term social or economic consequences that, in turn, set the stage for his commission of the offense. Likewise, the defendant's good behavior in prison after he committed the murders did not compel a finding that the defendant should not be held fully responsible for his crime. Finally, we conclude that it was not arbitrary for the panel to acknowledge the defendant's successful employment career but to conclude that that did not reduce his culpability. Lack of success in the employment setting is not a prerequisite to being held fully responsible for two horrific murders. In summary, we conclude the defendant's proof of the mitigating nature of the proved factual basis of the defendant's claims of mitigation was not "so clear and so compelling that the panel, in the exercise of reasoned judgment, could not have rejected it." *Breton II*, supra, 235 Conn. 229.

IV

CLAIM RELATED TO THE PANEL'S REJECTION OF
EXTREME EMOTIONAL DISTURBANCE AS
MITIGATING FACTOR

We next address the defendant's claim that his proof of a mental and volitional impairment resulting in extreme emotional disturbance was so compelling that the panel could not have rejected it as a nonstatutory mitigating factor. The defendant's claimed mitigating factor was that "[a]t the time of the offense, [the defen-

dant's] mental capacity was significantly impaired, and he suffered an extreme emotional disturbance which constituted a defense to the prosecution [under § 53a-54a (a)].[29] Although no such defense was presented in the guilt phase this Court can consider such as a nonstatutory mitigating factor." In support of this factor, the defendant presented evidence that he suffered from an untreated mental illness and alcoholism that were exacerbated by his separation and divorce from his wife and ultimately resulted in a psychological crisis when, during a very difficult period for him, he learned that she and their son had planned a vacation to Florida without him. We conclude that the defendant's proof did not compel a finding of mitigation.

We first note that we do not agree that the defendant met the requirements for the extreme emotional disturbance defense to murder set forth in § 53a-54a (a). In order to establish a defense under that statute, the defendant would have been required to establish that he acted "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." General Statutes § 53a-54a (a). We previously have rejected a claim that the "unique mental and emotional characteristics [of the

---

[29] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

defendant] and the impact of those factors on his perception of the circumstances" must be considered by the fact finder in determining whether the defendant's emotional disturbance was objectively reasonable. *State* v. *Dehaney*, supra, 261 Conn. 370. In doing so, we reasoned that "[s]uch an approach would . . . eliminate the barrier against debilitating individualization of the standard that the drafters [of the Model Penal Code, on which § 53a-46a (a) is modeled] intended to create by requiring that the explanation or excuse for a defendant's extreme emotional disturbance be reasonable." (Internal quotation marks omitted.) Id., 371.

In this case, the defendant argues that his underlying mental illness was exacerbated by his separation and divorce from his former wife and caused him to suffer extreme emotional disturbance when he learned that she and their son had planned a vacation trip to Florida in December, 1987.[30] Thus, it is implicit in the defendant's argument that his extreme emotional disturbance at the time of the offense was excused or explained by his psychological disorder, not by the conduct of his former wife and son, and, therefore, was not objectively reasonable. This is the type of claim that we rejected in *Dehaney*. Accordingly, to the extent that the defendant claims that his extreme emotional disturbance met the requirements of General Statutes (Rev. to 1995) § 53a-46a (g), we reject his claim.

Nevertheless, we recognize that, as a general matter, a defendant may attempt to establish that an extreme emotional disturbance resulting from a debilitating psychological disorder reduced his culpability for a capital offense, even though it did not have an objectively reasonable explanation or excuse so as to constitute a

---

[30] The defendant also argues that any murder in a domestic setting is, per se, committed under extreme emotional disturbance. This claim is considered and rejected in the proportionality review portion of this opinion. See part XIII of this opinion.

defense to murder under § 53a-54a (a). The evidence did not compel such a finding in the present case, however. The defendant's long-term friends, acquaintances and coworkers all testified that, although the defendant was, not surprisingly, somewhat depressed after his separation and divorce from his wife, to all appearances he was, and had been for many years, a normal, well-adjusted person and an "outstanding citizen" who was fully capable of forming long-term friendships and relationships and achieving success in the workplace. The panel reasonably could have discounted the testimony of the defendant's experts that he suffered from a long-term debilitating personality disorder as having been colored by the subjective and biased nature of the background information provided by the defendant and his family and by the defendant's natural anxiety and depression when he was interviewed in jail while awaiting trial for the murders. Moreover, as we have indicated, the panel's rejection of the defendant's claim that his mental impairment explained or excused his extreme emotional disturbance and, therefore, was mitigating does not necessarily imply its disbelief of the suffering inflicted upon him during his childhood or the effect of that suffering on his psyche. Nor does it reflect the panel's moral indifference to those matters. It indicates only that the panel concluded that the defendant's mental status was not sufficiently impaired to excuse or explain the extreme emotional disturbance that he claims to have suffered as a result of learning of the planned trip to Florida by his former wife and son, so as to reduce his culpability for this horrific crime. We conclude that that determination was reasonable.

V

THE PANEL'S PURPORTED FAILURE TO CONSIDER CUMULATIVE IMPACT OF MITIGATING EVIDENCE

The defendant next claims that the panel improperly failed to consider the cumulative impact of all of his

proposed mitigating evidence in determining whether he had proved a mitigating factor.[31] We disagree.

At the sentencing hearing, the panel stated that "the court finds proven by a fair preponderance of the evidence the following: number one, that the defendant was neglected, abandoned and the product of an abusive family unit during his childhood; number two, that the defendant has been a model prisoner at all times since his incarceration for the murders; number three, that he dropped out of school at age sixteen; and number four, that he was a good employee and a productive worker. The court further finds, however, that none of these factors either alone or in combination constitutes a mitigating factor considering all the facts and circumstances of this case." The defendant argues that "these factors" can only be understood to refer to the four mitigating factors the factual bases of which the defendant had proved, and, therefore, that the panel's statement demonstrates that it improperly failed to consider the cumulative effect of other mitigating evidence that, considered in isolation, it did not find to be convincing.

Among the defendant's nonstatutory mitigating factors, however, were the following catchall categories: "[t]hat any of the above listed factors either taken individually or in combination with any other factor, while not an excuse for the murder of [JoAnn] Breton and Robert Breton, Jr., but in fairness or mercy provides a reason for a sentence of life without the possibility of release"; "mercy"; that "[c]onsiderations of fairness and mercy constitute a basis for a sentence of life without the possibility of release"; and that "[d]eath is not the appropriate sentence for [the defendant]." We will not presume that, in determining that the defendant had proved only the factual underpinnings for each of the

---

[31] The defendant concedes that this claim was not preserved. We therefore review the claim under the *Golding* doctrine.

four specific mitigating factors enumerated previously, the panel had failed to consider whether the defendant had proved these claimed catchall factors. Nor will we presume that the panel considered only those four mitigating factors in reaching its determination on the catchall factors. The panel's statement that those four factors, taken alone or in combination, were not mitigating, logically does not compel a conclusion that it failed to consider the entire list of factors, both individually and cumulatively, in determining whether the catchall factors had been proved. Accordingly, we reject the defendant's claim.

## VI

## THE USE OF MITIGATING EVIDENCE TO PROVE AGGRAVATION

The defendant next claims that the panel improperly considered mitigating evidence produced by the defendant as proof of the aggravating factor. The state counters that we determined in *Breton II*, supra, 235 Conn. 256–59, that it was not improper for the state to rely on mitigating evidence to prove an aggravating factor and that the defendant has not provided us with any reason to revisit the question. We agree with the state.

As a preliminary matter, we address the reviewability of this claim. The defendant argues that this issue is reviewable on appeal because it "was raised and decided in the trial court . . . ."[32] Alternatively, the

[32] Prior to closing arguments in the second penalty phase hearing, the state asked the panel for a ruling on whether, within the confines of *Breton II*, the state could argue that evidence offered in mitigation supported the aggravating factor. After the state asked for this ruling, the following colloquy took place:

"Judge Fasano: Did you want to be heard at this point on that issue?

"[Attorney Barry Butler, Defense Counsel]: No, but I would suspect my position would be the same as the defendant's prior as well as the position of the people in the brief for the defendant in the prior opinion."

The panel ruled that the state could argue evidence offered in mitigation as proof of the aggravating factor, provided that such mitigating evidence satisfied the requirements of *Breton II*. The defendant did not object to this

defendant asserts that, even if we assume that this issue was not preserved, it is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude.[33] See *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that we need not consider whether the defendant properly preserved this issue, because we agree that the claim is reviewable under *Golding*. We further note that the state has not argued that the claim is unreviewable and has briefed the claim on its merits. We conclude, however, that the defendant cannot prevail under the third prong of *Golding*.

The following additional facts are relevant to this claim. As we previously have noted, at the defendant's second penalty phase hearing, the defendant offered Borden's expert testimony in support of his claims in mitigation. At the close of evidence, the state requested a ruling from the panel as to whether the state could argue evidence offered in mitigation as proof of the aggravating factor. The following colloquy took place on April 18, 1997:

"Judge Damiani: So, the . . . [issue] you're presenting . . . is [whether] the evidence being submitted on mitigation by [the] defendant which meet[s] the rules of evidence can be used as an aggravating factor?

"[Mr. John Connelly, State's Attorney]: Or argued as an aggravating factor. . . . I guess ultimately it will be determined whether or not the court can use it as an aggravating factor.

ruling. During its closing argument, the state, without objection from the defendant, did argue evidence offered in mitigation as proof of the aggravating factor.

[33] Specifically, as we previously have recognized in this opinion, "the need for heightened reliability in capital cases" implicates the eighth and fourteenth amendments. *Breton II*, supra, 235 Conn. 257; *State* v. *Ross*, supra, 230 Conn. 230.

"Judge Damiani: If you are allowed to argue it—

"[Connelly]: That's what I mean."

On April 22, 1997, the panel ruled that the state could argue, and the panel could consider, evidence submitted in mitigation as proof of the aggravating factor, within the boundaries set forth by *Breton II*, supra, 235 Conn. 256–58.[34] In *Breton II*, the defendant had claimed "that the trial court improperly permitted the jury to consider certain testimony of Borden as proof of the aggravating factor that the defendant committed the two murders in an especially cruel manner." Id., 256. The defendant argued that, "because evidence relevant to mitigating factors need not otherwise comport with the rules of evidence; see General Statutes [Rev. to 1995] § 53a-46a (c);[35] the use of such evidence to establish an aggravating factor is inconsistent with the need for heightened reliability in capital cases." Id., 257. We rejected this claim, stating that "[w]e are dubious . . . of the defendant's . . . federal constitutional claim . . . that evidence offered in mitigation of the death penalty should not be available for use by the state to prove an aggravating factor because relevant mitigating evidence need not otherwise satisfy our evidentiary rules. Although the defendant claims that it is unfair to let the state

[34] The panel, *Fasano, J.*, stated, "we're going to follow the lead of the Supreme Court in [*Breton II*, supra, 235 Conn. 256–58] with respect to their analysis of the same issue and reject the arguments of [the] defendant and find that no legitimate reason exists not to allow consideration of such evidence relative to the aggravating factor."

[35] General Statutes (Rev. to 1995) § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section. . . .

"(c) In such hearing . . . [a]ny information relevant to any mitigating factor may be presented by either the state or the defendant, *regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but the admissibility of information relevant to any of the aggravating factors set forth in subsection (h) shall be governed by the rules governing the admission of evidence in such trials. . . .*" (Emphasis added.)

prove an aggravating factor in reliance on evidence that does not meet threshold standards of admissibility, the defendant does not explain why, as a matter of federal constitutional law, evidence that is sufficiently reliable for purposes of establishing a mitigating factor is necessarily of insufficient reliability to establish an aggravating factor. Nevertheless, we need not decide today whether a capital defendant would never be entitled to the relief sought here. In this case, the defendant makes no claim that Borden's testimony regarding the defendant's description of the murders was inadmissible under our evidentiary rules. Accordingly, the defendant cannot demonstrate that he was prejudiced by the introduction of any inherently unreliable evidence." Id., 258–59.

There are three prongs to the defendant's argument in the present case. First, the defendant argues that we should overrule *Breton II* and hold that the federal constitution prohibits the use of evidence offered in mitigation as proof of an aggravating factor. Second, the defendant contends that we should overrule *Breton II* because its holding is inconsistent with our statutory capital sentencing scheme. Finally, the defendant maintains that even if we were to reaffirm our holding in *Breton II*, in the present case, in finding an aggravating factor the panel went beyond the scope of that holding and considered evidence offered in mitigation that did not meet the requirements of the rules of evidence. We decline the defendant's invitation to overrule *Breton II*, and we conclude that the panel did not exceed the scope of that holding in considering mitigating evidence as proof of the aggravating factor.

First, in asking us to overrule *Breton II*, the defendant contends that the eighth amendment to the federal constitution prohibits use of evidence of mental illness and an abusive background offered in mitigation to be considered as proof of an aggravating factor. Upon a

thorough review of the record, however, we conclude that the state did not argue, nor did the panel consider, evidence of the defendant's mental illness as proof of the aggravating factor. Rather, the state argued that the factual account of the events that transpired the night of the murders as told by the defendant to Borden corroborated the testimony of the state's two expert witnesses who had reconstructed the events of that night and offered independent evidence of the aggravating factor. Accordingly, we need not reach the merits of the defendant's constitutional claim.

Second, the defendant contends that use of evidence offered in mitigation as proof of an aggravating factor is inconsistent with the allocation of the burdens of proof under our statutory capital sentencing scheme. The defendant contends that under our statutory scheme, evidence offered in mitigation must be proved by a preponderance of the evidence, while evidence of an aggravating factor must be proved beyond a reasonable doubt. The defendant maintains that this allocation of the burdens of proof will be undermined if the state is allowed to use evidence offered in mitigation as proof of an aggravating factor. We disagree.

This court addressed the allocation of the burdens of proof under our capital sentencing scheme in *State v. Daniels*, 207 Conn. 374, 384–85, 542 A.2d 306, after remand for articulation, 209 Conn. 225, 550 A.2d 885 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). In that case, we concluded that the defendant must prove a mitigating *factor* by a preponderance of the evidence. The defendant need not prove each piece of evidence offered in mitigation by a preponderance of the evidence, however. Rather, all of the evidence offered in mitigation, taken together, must prove the mitigating *factor* by a preponderance of the evidence. On the other hand, the state must prove the aggravating *factor* beyond a reasonable doubt. This

does not mean that each piece of evidence offered by the state in its effort to prove the aggravating factor must be proved beyond a reasonable doubt. Rather, the state is limited to offering evidence that satisfies the rules of evidence. Accordingly, it is not inconsistent with the allocation of the burdens of proof under our statutory scheme to allow the state to use evidence offered in mitigation to meet its burden of proving an aggravating factor beyond a reasonable doubt, provided that such mitigating evidence offered by the state satisfies the requirements of the rules of evidence.

Finally, the defendant contends that even if we decline to overrule *Breton II*, the panel in the present case went beyond this court's holding in *Breton II* when it considered all of the evidence offered in mitigation, regardless of its admissibility under the rules of evidence, in deciding whether an aggravating factor existed. We disagree. Contrary to the defendant's contention, the panel clearly stated that its ruling that the state could rely on mitigating evidence to support its aggravating factor was limited to "evidence being submitted on mitigation by [the] defendant *which meet[s] the rules of evidence*," pursuant to *Breton II*. (Emphasis added.) Our careful review of the record reveals nothing to suggest that the panel went beyond that ruling by allowing the state to rely on mitigating evidence that was otherwise inadmissible.[36]

Accordingly, we affirm our holding in *Breton II* and conclude that there is no constitutional bar to using

[36] The defendant claims that the panel considered inadmissible mitigating evidence in support of the aggravating factor because, on cross-examination of the defendant's expert witness, the state referred to several acts of misconduct by the defendant toward his former wife and to his manslaughter conviction for his father's death. These references were made in an attempt to impeach the testimony of the defendant's expert witnesses, however, and were not relied on by the state during its closing argument in support of its claimed aggravating factor.

evidence offered in mitigation that meets the requirements of the rules of evidence as proof of an aggravating factor. We further conclude that allowing the state to use mitigating evidence to prove an aggravating factor is not inconsistent with our statutory capital sentencing scheme. Finally, we conclude that the panel properly confined itself to consideration of evidence that fell within the scope of our ruling in *Breton II*. Accordingly, we conclude that there was no constitutional violation and that the defendant was not deprived of a fair trial and that his claim therefore fails under the third prong of *Golding*.

## VII

### THE PANEL'S PURPORTED FAILURE TO ARTICULATE THE FACTUAL BASIS OF ITS VERDICT

The defendant next claims that the panel violated his rights under the eighth amendment and the due process clause of the federal constitution when it failed to articulate the factual basis of its verdict pursuant to Practice Book, 1997, § 4059 (now § 64-1).[37] The state contends that this claim is governed by our decision in *Cobb II*, supra, 251 Conn. 379–84, 393–97, 422–26, 451–52, and that no further articulation is required. We agree with the state.

The following additional facts are necessary for resolution of this claim. On April 23, 1997, the panel, pursuant to General Statutes (Rev. to 1995) § 53a-46a (e),[38]

[37] Practice Book, 1997, § 4059 (a) (now § 64-1) provides in relevant part: "(2) [I]n decisions on aggravating and mitigating factors in capital penalty hearings conducted to the court . . . the court shall, either orally or in writing, state its decision on the issues in the matter. The court shall include in its decision its conclusion as to each claim of law raised by the parties and the factual basis therefor. . . ."

[38] General Statutes (Rev. to 1995) § 53a-46a (e) provides: "The jury or, if there is no jury, the court shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor."

returned its special verdict. As we previously have noted in this opinion, the panel stated that "the state has proven beyond a reasonable doubt that the defendant committed both murders in an especially cruel manner as per [General Statutes (Rev. to 1995) § 53a-46a (h) (4)] . . . . Regarding mitigation . . . the court finds that the defendant has failed to prove either of the alleged statutory mitigating factors by a fair preponderance of the evidence. With respect to the nonstatutory mitigating factors the court finds proven by a fair preponderance of the evidence the following: number one, that the defendant was neglected, abandoned and the product of an abusive family unit during his childhood; number two, that the defendant has been a model prisoner at all times since his incarceration for the murders; number three, that he dropped out of school at age sixteen; and number four, that he was a good employee and a productive worker. The court further finds, however, that none of these factors either alone or in combination constitutes a mitigating factor considering all the facts and circumstances of this case."

On December 31, 1998, the defendant filed a motion for articulation of the factual and legal basis for the panel's oral verdict.[39] The panel denied the motion.

[39] Specifically, the defendant requested an articulation of the following issues: (1) Did the panel apply the *Breton I* definition of cruel? (2) Did the panel consider Borden's testimony concerning the defendant's confession to the crime and, if so, what factual findings did it make on the basis of that evidence? (3) Given that the panel accepted part of the testimony of the defendant's experts, did it reject other aspects of that testimony and, if so, why? (4) Having found as a factual matter that the defendant was neglected, abandoned and the product of an abusive family unit during his childhood, did the panel accept the diagnosis of the defendant's experts as to the resulting mental condition and, if not, why? (5) If the panel accepted the mental health expert's diagnosis, did it nonetheless find that the defendant's mental and volitional capacity was not significantly impaired at the time of the crime and, if so, why? (6) Did the panel consider and reject each and every nonstatutory mitigating factor claimed by the defendant? (7) Did the panel make a finding that each claimed mitigating factor was not mitigating in nature and, if so, why? (8) If the panel found that any nonstatutory mitigating factor was both established by the evidence and

Thereafter, on February 11, 1999, the defendant filed with this court a motion for review of the denial of his motion for articulation. The state filed an objection to the defendant's motion for review on February 26, 1999, and on December 23, 1999, we granted the defendant's motion, but denied the relief requested therein.

This court previously has had occasion to consider the circumstances under which an articulation of a special verdict in a death penalty case is required. In *Cobb II*, the panel returned a special verdict similar to the verdict rendered by the panel in this case. Specifically, as to the mitigating factors, the panel in *Cobb II* stated: "[W]e find that the defendant has not proven by a fair preponderance of the evidence that at the time of the murder of [the victim], the defendant['s] . . . mental capacity was significantly impaired, nor his ability to conform his conduct to the requirements of law was significantly impaired. Further, we find that the defendant has not proven by a fair preponderance of the evidence that the defendant was under the influence of emotional disturbance at the time of the offense, or that he suffered or suffers from a mental disorder. We have considered all of the defendant's list of proposed mitigating factors submitted on August 5, 1991, and all evidence that was presented to us in mitigation. Considering all of the facts and circumstances of this case, we do not find the defendant has proven by a fair preponderance of the evidence any factor that can be considered as mitigating." (Internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 451–52.

The defendant in *Cobb II* claimed that this verdict did not comply with Practice Book § 64-1 (formerly § 4059). Id., 451. We disagreed, reasoning that, "substan-

mitigating in nature, did it make a finding that it was or was not mitigating considering all the facts and circumstances of the case and, if it found that it was not mitigating under the facts and circumstances of the case, what were those facts and circumstances that rendered the factor not mitigating?

tively, in its verdict the panel stated all that it was required to state. The general purpose of these rules of practice and their interplay is to ensure that there is a trial court record that is adequate for an informed appellate review of the various claims presented by the parties. . . . One specific purpose of a motion for articulation of the factual basis of a trial court's decision is to clarify an ambiguity or incompleteness in the legal reasoning of the trial court in reaching its decision. . . . Further articulation of a panel's criminal verdict is unnecessary where the verdict adequately states its factual basis, and where the record is adequate for informed appellate review of the verdict. In the present case, the panel adequately stated the factual basis for its verdict, and the record is adequate for purposes of an informed appellate review." (Citations omitted; internal quotation marks omitted.) Id., 383.

Likewise, we conclude in the present case that the panel stated all that it was required to state. The special verdict adequately stated its factual basis and the trial court record is adequate for informed appellate review. There is nothing ambiguous in the panel's special verdict, and it is not incomplete. Accordingly, we conclude that no further articulation of the panel's special verdict is required.

## VIII

### CLAIM RELATING TO THE DEFENDANT'S REQUEST FOR A HEARING TO CONSIDER RACIAL DISPARITIES IN THE ADMINISTRATION OF THE DEATH PENALTY

We next consider the defendant's claim that the trial court improperly denied his request for a hearing to determine whether racial disparities in the administration of the death penalty statute violated his constitu-

tional rights[40] and the statutory requirement that the death sentence not be "the product of passion, prejudice or any other arbitrary factor . . . ." General Statutes (Rev. to 1995) § 53a-46b (b) (1). We disagree.

The following facts and procedural history are relevant to this claim. On April 2, 1997,[41] several days before the commencement of the second penalty phase hearing, the defendant filed a motion in limine seeking to impose a life sentence on the grounds that race has an impermissible effect on capital sentencing decisions in Connecticut; a notice of intent to request an evidentiary hearing, in the event that the panel returned a verdict of death, to determine whether the verdict was the result of "passion, prejudice or any other arbitrary factor"; General Statutes (Rev. to 1995) § 53a-46b (b) (1); a motion for a hearing in support of his motion for imposition of a life sentence; and a motion for a continuance of the sentencing proceeding for several months, in the event that the panel sentenced the defendant to death, in order to develop the claims raised in his motion for imposition of a life sentence. On April 3, 1997, he filed a motion for the imposition of a life sentence claiming, inter alia, that race has an impermissible impact on the administration of the death penalty in Connecticut. At a hearing on those motions on April 9, 1997, the trial court indicated that it would defer its ruling on the motions until the conclusion of the sentencing hearing. At the same time, the trial court deferred its ruling on a previous motion by the defendant to impose a life sentence on the basis of the unconstitutionality of lethal injection as a method of execution.

---

[40] The defendant argues that this claim implicates his constitutional rights under the eighth amendment and the equal protection clause of the fourteenth amendment to the United States constitution and article first, §§ 8, 9 and 20, of the Connecticut constitution.

[41] The motion was dated March 31, 1997.

The panel reached its special verdict on April 23, 1997. A hearing on the constitutionality of lethal injection was held from October 6 through October 24, 1997. On October 16, 1997, while that hearing was in progress, the defendant filed a request for disclosure and production seeking certain information from the state pertaining to his racial disparity claim. At the close of the hearing, the defendant moved for a continuance of the proceedings for several months in order to develop that claim further.

The defendant's motion for a continuance and the underlying motion for imposition of a life sentence were argued at a hearing on December 5, 1997. At that hearing, the state argued that this court's statement in *State v. Cobb*, 234 Conn. 735, 762, 663 A.2d 948 (1995) (*Cobb I*), that, under § 53a-46b (b) (1), the defendant was required to create a statistical record in the trial court pertaining to his racial disparity claim before presenting the claim on appeal, was dicta because the defendant in that case had not raised a claim under that statute. The state further argued that the trial court had no jurisdiction to hold a hearing because General Statutes (Rev. to 1995) § 53a-46b (b) (1) vests original jurisdiction in the Supreme Court to determine, after a death sentence has been imposed, whether it was the product of "passion, prejudice or any other arbitrary factor . . . ." The state also argued that, even if the trial court were to determine that it had jurisdiction to conduct a presentence hearing on the issue, the defendant was not entitled to a hearing because he had not made and could not make any preliminary showing that the panel's verdict was a result of an improper passion or prejudice held by the panel, or that the state had acted arbitrarily in prosecuting the defendant. Finally, the state argued that the defendant should have raised the issue long ago. The defendant argued that *Cobb I* required that the racial disparity question be raised

before the trial court. He further argued that he would be prepared to answer the questions raised by the state pertaining to the applicability of § 53a-46b (b) (1) within a matter of weeks. At the conclusion of the hearing, the court indicated that it would continue the proceedings so that the defendant could address the arguments raised by the state.

The next hearing was held on December 19, 1997. At that hearing, the court raised a new jurisdictional question. Specifically, the court noted that, in his first appeal to this court, the defendant had raised a claim under General Statutes (Rev. to 1995) § 53a-46b (b) (3)[42] that the death penalty was excessive and disproportionate to the penalty imposed in similar cases, just as the defendant in *Cobb I* had claimed. The court stated that the racial disparity claim being raised by the defendant in the second sentencing hearing was either related to that previous claim, which this court had not reached in the first appeal because we reversed the judgment on the grounds of instructional impropriety, or it was being raised for the first time in the second hearing. The court expressed its concern that, in either case, the issue was beyond the scope of the limited remand from the original appeal. Defense counsel stated that he had not raised the claim in his first appeal. Rather, he first became aware of the racial disparity issue at the time of the *Cobb I* decision in 1995 and first raised it in his motion to impose a life sentence at the beginning of the second penalty phase hearing in April, 1997.[43] He argued, however, that all sentencing issues were within the scope of the remand after the first appeal. The state

[42] Subdivision (3) of General Statutes (Rev. to 1995) § 53a-46b (b) was deleted effective April 12, 1995. Public Acts 1995, No. 95-16. Unless otherwise specified, all references and citations in this opinion to § 53a-46b (b) (3) are to that statute as revised to 1995.

[43] Defense counsel also stated that a racial disparity claim "probably was brought under [§ 53a-46b (b) (3)]" in the defendant's first appeal. Our review of the briefs in that case, however, reveals that no such claim was brought.

argued that the trial court did not have jurisdiction to hear the issue. At the conclusion of the hearing, the trial court indicated that counsel would have the opportunity to submit briefs on the jurisdictional issue before the court made its decision.

The next hearing was held on January 9, 1998. At that hearing, defense counsel again argued that all sentencing issues, including the defendant's racial disparity claim, were within the scope of the remand on the first appeal. The state rested on its brief and requested that the court proceed immediately with sentencing without holding a hearing on the racial disparity claim. The court concluded that it did not have jurisdiction to consider the defendant's motion for a continuance and a hearing because the statute "requires a review by the Supreme Court of any death sentence imposed. It's not an issue related to the purpose of the remand. No sentence has been imposed to this point. Furthermore, claims made pursuant to [§ 53a-46b (b)] are currently pending in the Supreme Court, awaiting resolution of the remand. . . . The matter may ultimately be remanded, as in *Cobb* [*I*], for an evidentiary hearing. But, that's a decision for the Supreme Court to make, since it did indicate in the *Cobb* decisions that such a remand would not necessarily be appropriate in all cases." The court then sentenced the defendant to death.

On appeal, the defendant argues that, under *Cobb I*, supra, 234 Conn. 735, the trial court was required to hold an evidentiary hearing so that the defendant could present statistical evidence in support of his racial disparity claim. He further argues that our remand order in *Breton II* was sufficiently broad to encompass such a hearing. We conclude that the trial court improperly determined that it did not have jurisdiction to hold a hearing pursuant to § 53a-46b (b) (1). We also conclude,

however, that the defendant was not entitled to such a hearing under the circumstances of the present case.

We begin our analysis of this claim with a review of our decision in *Cobb I*, supra, 234 Conn. 735. The defendant in that case had moved for enlargement of the class of similar cases that this court could consider in determining whether his death sentence was justified in light of the prohibition against disproportionality provided by § 53a-46b (b) (3). Id., 737. Specifically, the defendant requested that we consider " 'all cases prosecuted in Connecticut after October 1, 1973, in which a capital felony *could have been charged* pursuant to . . . § 53a-46b and which resulted in a homicide conviction, following a plea or trial.' " (Emphasis in original.) Id., 738. The defendant argued that this expanded universe of cases was necessary to enable this court to evaluate his claim that race has an impermissible effect on capital sentencing decisions in Connecticut. Id. We rejected the defendant's claim, concluding that "the legislature did not intend proportionality review to encompass a comparison with all homicide cases prosecuted since 1973 in which a capital felony could have been charged." Id., 747.

We also concluded, however, that the defendant could have raised his racial disparity claim under § 53a-46b (b) (1). Under that statute, however, "it would have been necessary for the defendant to have made his statistical record in the trial court, and to have subjected it to a full evidentiary hearing, as in [*McCleskey* v. *Zant*, 580 F. Sup. 338 (N.D. Ga. 1984), aff'd sub nom. *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)], before presenting it on appeal. To hold that he could raise this claim on appeal under § 53a-46b (b) (1), without having first created an adequate factual basis in the trial court, would be incorrect for many of the same reasons that we reject his claim under § 53a-46b (b) (3), because it would assume, with-

out any clear indication, that the legislature intended this court to engage in the same extraordinary process of data gathering and fact-finding. Thus, both subdivision (1) and subdivision (3) of § 53a-46b (b) ordinarily contemplate not data gathering and fact-finding by or under the aegis of this court from disputed evidence, which the defendant's claim would require, but evaluation by this court of the trial court record of the case on appeal, and with respect to subdivision (3), of the trial court records of similar cases." *Cobb I*, supra, 234 Conn. 762.

Finally, we concluded in *Cobb I* that, "even though the defendant has not created a trial record in this case that would permit him to present, in his direct appeal, his statistical claim under § 53a-46b (b) (1) . . . he should be permitted to do so by way of a postappeal habeas corpus petition . . . . Although ordinarily habeas corpus cannot serve as a surrogate for a claim that could have been presented on direct appeal . . . we conclude that, with respect to the claim that the defendant seeks to present by this motion, he should not be bound by that principle because the scope and meaning of § 53a-46b (b) have remained uncertain and, until now, have been the subject of only one published decision of this court . . . . Furthermore, the nature of the defendant's claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim." (Citations omitted.) Id., 762–63.

In *Cobb II*, we reaffirmed our holding in *Cobb I* that a racial disparity claim "was cognizable under § 53a-46b (b) (1), but must [be] based on a full evidentiary hearing made at trial in the trial court." *Cobb II*, supra, 251 Conn. 499. Because the defendant had not made such a record at the trial court, he was required to proceed by way of a habeas petition. Id. In support of this conclusion, we noted "two further aspects of [his]

claim. First . . . this claim was brought in *Cobb I* by motion of the defendant's separate proportionality counsel *'because the defendant's other appellate counsel [did] not intend to raise such a claim under § 53a-46b (b) (1).'* . . . *Cobb I*, supra, 234 Conn. 740. Needless to say, that 'other appellate counsel' is the same counsel who now brings this claim, nearly four years later. Second, this appeal was filed in October, 1991. The defendant's brief was not filed in this court until February, 1997, more than six years later. Under these circumstances, it ill behooves the defendant's counsel to request a remand for an evidentiary hearing (1) on a claim that he represented nearly four years earlier he did not intend to bring, and (2) in an appeal the disposition of which has been delayed for nearly eight years largely because of his delay in filing his brief. We see no valid reason to delay the disposition of this appeal further. The state, the victim's family and the defendant are entitled to a disposition of this appeal now." (Emphasis in original.) *Cobb II*, supra, 499–500 n.105.

The trial court in the present case appears to have concluded that, under *Cobb I*, jurisdiction is vested in this court to determine in the first instance whether an evidentiary hearing on a racial disparity claim under § 53a-46b (b) (1) is required and, if so, to remand the case to the trial court for that purpose. That conclusion is inconsistent, however, with our statements in *Cobb I* that (1) our initial review of a claim under § 53a-46b (b) (1) requires "evaluation by this court of the trial court record of the case on appeal"; *Cobb I*, supra, 234 Conn. 762; and (2) a defendant who fails to create such a record in the trial court is not entitled to a remand for that purpose but, *at most*, is entitled to raise the claim in a habeas proceeding. See id., 763 n.21 ("[w]e leave to another day, and to a case that properly presents it, the question of whether a defendant who had ample notice and opportunity, as a result of the publica-

tion of this opinion, to create a trial court record sufficient for an appellate claim under § 53a-46b [b] [1] in his direct appeal, but did not do so, could nonetheless do so by way of a postappeal habeas corpus action").

To the extent that the trial court's conclusion was based on its belief that a racial disparity claim was raised in the defendant's first appeal to this court and was still pending here after remand, we also reject that reasoning. First, no such claim was brought in the first appeal. Second, even if it is assumed that such a claim had been brought, we did not reserve jurisdiction over any of the issues raised in that appeal or limit the scope of the remand for a new penalty phase hearing in any way. Therefore, the defendant was entitled to raise any matters in the second sentencing hearing that he could have raised in the first sentencing hearing. See *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 523, 686 A.2d 481 (1996) ("[i]f a judgment is set aside on appeal, its effect is destroyed and the parties are in the same condition as before it was rendered"); *State* v. *Darwin*, 161 Conn. 413, 419, 288 A.2d 422 (1971) ("The trial [after reversal of the original judgment] is 'new' in every sense. It is as if no trial had ever taken place. . . . It would not be compatible with the theory of a new trial to tie the hands of counsel so that any errors waived in the first trial are forever waived." [Citations omitted.]). Accordingly, we conclude that the trial court improperly determined that it did not have jurisdiction to grant the defendant's request for a hearing under § 53a-46b (b) (1).

We also conclude, however, that, "[a]lthough the defendant had a right to an evidentiary hearing, he was not entitled to an indefinite period of time within which to attempt to develop facts in support of his claim." *State* v. *Reynolds*, 264 Conn. 1, 231, 836 A.2d 224 (2003). In *Reynolds*, we stated that "[t]he defendant estimated that he would have needed four to six months to obtain

and evaluate the data relevant to his claim; nevertheless, to date, that task has not been completed. Moreover, once the defendant has completed his research and analysis, the state must be afforded sufficient time to review that data and any conclusions that the defendant contends may be drawn therefrom.

"In light of the nature and magnitude of the work necessary to prepare the claim for a hearing—as evidenced by the fact that such work has not yet been completed—an extraordinary, indeed, indefinite, delay in the imposition of sentence would have been required to accommodate the defendant's request for a hearing prior to sentencing. Such a lengthy postponement of the hearing simply would not have been acceptable. Indeed, even without the benefit of hindsight, it would not have been reasonable for the defendant to have expected the court to grant the four to six month postponement he requested, especially in view of the fact that the court could not possibly have been assured that the matter would be ready for a hearing even in that extended time frame. Under the circumstances, therefore, there is no reasonable possibility that the trial court would have permitted the requested extension of time . . . ." Id.

In the present case, the defendant also asked for a continuance of several months to obtain and evaluate the relevant data.[44] Moreover, the defendant concedes

[44] In his April 2, 1997 motion for a continuance, the defendant represented that the continuance "would be for several months at the minimum . . . ." On October 24, 1997, the defendant filed another motion for a continuance for several months in order to complete his factual investigation of the racial disparity claim. At the December 5, 1997 hearing on the motion for continuance, defense counsel represented that, at some point, he would be prepared to come to the court and answer the court's questions as to how racial disparities in the administration of the death penalty affected a white defendant who had killed white victims. At the December 19, 1997 hearing, defense counsel filed a memorandum in which he argued as a matter of law that the defendant had standing to raise his racial disparity claim regardless of the defendant's race or the race of the victims, but did not set forth any theory as to how the defendant's case had been affected by impermissible

that, as a result of our decision in *Cobb I*, he, unlike
the defendant in that case, had notice of the need to
create a trial court record on his racial disparity claim.
Indeed, he attempts to enlist that fact in his attack on
the trial court's ruling, arguing that, because the trial
court was aware that he had such notice, the trial court
improperly concluded that his procedural posture was
similar to that of the defendant in *Cobb I*, and that the
defendant was required, therefore, to raise his claim in
a habeas proceeding.[45] The defendant fails adequately
to explain, however, why, having been aware of his
obligation under *Cobb I* to create a trial court record
on his racial disparity claim, he waited until the eve of
the second penalty phase hearing to raise the matter
and, even then, was not prepared to submit evidence
on the question. The defendant attempted to justify to
the trial court the tardiness of his claim by stating that
he had not been aware that a racial disparity claim
could be brought under § 53a-46b (b) (1) until after the
*Cobb I* decision.[46] That does not explain, however, why:
(1) he had not raised the claim under § 53a-46b (b) (3),
as the defendant in *Cobb I* had done, during the more
than six years between the date of his conviction and
the date of our *Cobb I* decision; (2) he did not raise the
claim under § 53a-46b (b) (1) during the twenty months
between our decision in *Cobb I* and the commencement

racial considerations. He also indicated to the trial court that a "long labori-
ous study . . . needs to be done to put on this claim." At the time that the
trial court ruled on the defendant's request for a hearing and his motion
for a continuance on January 9, 1998, the defendant still had not provided
the trial with a specific time frame for his investigation and documentation
of his claim.

[45] As we have noted, we do not believe that this is what the trial court
concluded. Rather, the trial court concluded that this court had jurisdiction
to determine in the first instance whether a hearing was required and, if
so, to remand to the trial court for that purpose.

[46] Defense counsel further argued that he had not represented the defen-
dant until 1995 and, prior to the verdict in this case, he was too busy working
on other death penalty appeals to gather data in support of this claim.

of the second penalty hearing; and (3) he was not prepared at that time that he finally raised the claim to present evidence in support of it, or even to establish a prima facie case of prejudice. Indeed, there is no indication in the record that the defendant is prepared today to put on evidence in support of his racial disparity claim.

With respect to the defendant's argument that his racial disparity claim under § 53a-46b (b) (1) was not ripe until the panel reached its verdict,[47] we conclude that, even if it is assumed that the defendant is correct, that would not excuse his failure to investigate and gather evidence in support of his claim until that time. It simply "would not have been reasonable for the defendant to have expected the court to grant the . . . postponement [of several months] he requested, especially in view of the fact that the court could not possibly have been assured that the matter would be ready for a hearing even in that extended time frame." *State* v. *Reynolds*, supra, 264 Conn. 231. Accordingly, we conclude that "the proper course is not to remand the defendant's claim to the trial court but, rather, to afford the defendant an opportunity to renew his claim by way of a habeas corpus petition." Id., 232.

We noted in *Reynolds* that, "since our decisions in *Cobb I* and *Cobb II*, subsequent events have overtaken both the claim that the defendant raises in the present case and the same claim made by Cobb in his case. These events reaffirm our conclusion that the defendant

---

[47] We held in *Cobb I* that § 53a-46b (b) (1) "contemplate[s] not data gathering and fact-finding by or under the aegis of this court from disputed evidence . . . but evaluation by this court of the trial court record of the case on appeal . . . ." *Cobb I*, supra, 234 Conn. 762. We did not indicate, however, whether the contemplated presentation of evidence should be held during the penalty phase hearing in front of the sentencing jury or panel, as the case may be, or after the verdict but before sentencing, or after the sentencing. There is no need to decide that issue in this case in light of our conclusion that the defendant was not entitled to a hearing in any case.

should be required to pursue his claim in a habeas corpus proceeding in the trial court." Id. Specifically, "[a]t some time after our decision in *Cobb I*, which was released in 1995, the office of the public defender began to collect the data that it deemed necessary to establish the claim. In November, 2002 . . . the office of the public defender informed this court that it had completed its collection of the data and that an expert's report analyzing the data would be completed by January 1, 2003. The office of the public defender also informed us that its preparation for a hearing on the data and report would take an additional three to six months. That time period does not include, however, the time necessary for the state to prepare its response to the claim. In December, 2002, Chief Justice William J. Sullivan appointed former Chief Justice Robert Callahan to serve as a special master to manage the process and timetable by which the claim would be litigated in the habeas court. At this point, we have received no further information regarding the status of that litigation.

"It is apparent, therefore, that neither the office of the public defender nor the state is ready to litigate the merits of this claim in the immediate future. It is also apparent that judicial economy, as well as fairness to both defendants and the state, mandates that this claim be litigated before the same habeas judge and in the same general, consolidated hearing, on behalf of all defendants who have been sentenced to death.

"Our conclusion applies to the defendant in the present case. The defendant will have a full opportunity to present his claim in the habeas court and, as we previously have indicated, is not prejudiced in any way by the relegation of his claim to that forum." Id., 232–33.

We concluded in *Reynolds* that all racial disparity claims in pending death penalty cases should be "pre-

sented in the consolidated habeas proceeding to which we have referred so that it may be litigated and resolved at the trial level in one proceeding, rather than several." Id., 233–34. Accordingly, if the defendant in the present case intends to pursue this claim, he must do so in that proceeding.

## IX

## THE SUFFICIENCY OF THE EVIDENCE OF THE AGGRAVATING FACTOR

The defendant next claims that the evidence presented by the state at the second penalty phase hearing failed to prove beyond a reasonable doubt that the defendant committed the capital felony in an especially cruel manner. The state maintains that the panel at the second penalty phase hearing was presented with the same evidence as was determined to be sufficient in *Breton II* and that there is no reason to revisit this issue. We agree with the state.

We begin by setting forth the applicable standard of review. "In reviewing a claim under § 53a-46b (b) (2) that the evidence fail[ed] to support the finding of an aggravating factor specified in subsection (h) of § 53a-46a, we will subject that finding to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional factfinding . . . . However, [e]ven with the heightened appellate scrutiny appropriate for a death penalty case, the defendant's challenge to the sufficiency of the evidence of aggravating circumstances must be reviewed, in the final analysis, by considering the evidence presented at the defendant's penalty hearing in the light most favorable to sustaining the facts impliedly found by the jury. . . . Furthermore, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with [the existence of the aggravating factor] and is not

required to draw only those inferences consistent with [its nonexistence]. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *Breton II*, supra, 235 Conn. 221.

The following additional facts are necessary for the resolution of this claim. At the second penalty phase hearing, the state presented the testimony of Arkady Katsnelson, an associate medical examiner of the state's chief medical examiner's office and of Henry Lee, the state's chief criminalist and director of the state police forensic laboratory.[48] Katsnelson visited the scene of the murders and performed autopsies on both the defendant's former wife, JoAnn Breton, and the defendant's son, Robert, Jr. On the basis of his observations, Katsnelson testified about the nature and severity of the injuries sustained by each victim. Lee had attempted to reconstruct the crime scene on the basis of physical evidence, photographs and various reports, and he testified about the sequence of events that took place on the night of the murders.

On the basis of the testimony of Katsnelson and Lee, the panel reasonably could have found the following facts pertaining to the murder of JoAnn Breton. The defendant severely beat her before killing her. There were extensive contusions and abrasions caused by blunt force trauma on her forehead, around her right eye, on her right cheek, right arm, right knee, lower right leg, nose, left cheek, left eye, mouth, chin and the area under her chin. In addition, there was an extensive amount of blood in her nose and mouth. These injuries were the result of multiple blows and occurred before JoAnn Breton died.

---

[48] Both Katsnelson and Lee testified at the first penalty phase hearing. *Breton II*, supra, 235 Conn. 221.

The defendant stabbed JoAnn Breton three times with a long sharp instrument. He stabbed her once in the chest. That wound penetrated into the underlying fat tissue and muscles of the chest, but not into the chest cavity. He also stabbed her twice in the neck. One of those stab wounds entered the front of her throat and exited out the right side of her neck, causing injury to the carotid artery. It was this injury that caused JoAnn Breton to bleed to death.

Finally, JoAnn Breton was conscious throughout the beating that resulted in the contusions to her face and body and was conscious when the stab wounds were inflicted. She received at least one major injury while standing on the right side of her bed. Bloodstain pattern evidence on the telephone, the bed and bedding, the floor and the walls indicated that she moved from the head of the bed to the foot of the bed while bleeding profusely. She struggled with the defendant at the foot of the bed. She then moved around to the left side of the bed, toward the bedroom door. While she was still standing, the defendant stabbed her fatally through the neck. She fell to her knees and another struggle ensued in this area. She eventually lay on the floor, face down, and was subsequently rolled to her back before she bled to death.

On the basis of the testimony of Katsnelson and Lee, the panel reasonably could have found the following facts in regard to the murder of Robert, Jr. The defendant cut and stabbed Robert, Jr., repeatedly with a long sharp instrument before he inflicted the fatal wound. During the course of this assault, Robert, Jr., suffered a two and one-half inch long incised wound on his right cheek;[49] an incised wound on the front of his chest, with a blunt force contusion and abrasion just below

[49] An incised wound is a cut where the wound does not penetrate deeply inside the soft tissue.

it; a stab/incised wound on his upper left arm; and defensive wounds across the palms and fingers of his right hand, indicating that he had attempted to grab the knife. In addition, Robert, Jr., suffered two defensive wounds to his right arm, one of which was extensive, measuring six inches in length and exposing the underlying muscle; two defensive wounds on the top of his left hand; and an extensive stab wound, measuring approximately four inches in length, on his back, close to his left shoulder. From that shoulder wound there was a ten inch incised wound leading up to his left shoulder. He suffered stab wounds on his right elbow, under his chin, and on the upper part of his neck; a stab wound to the left side of his neck that measured one and one-quarter inches across and five inches deep; and a large stab/incised wound on the right side of his neck that measured five inches in length and almost completely severed his carotid artery. It was the stab wound to the right side of his neck that ultimately caused Robert, Jr., to bleed to death.

All of the wounds were inflicted while Robert, Jr., was alive and while he was conscious. The defendant first stabbed him while he stood in the doorway to his mother's bedroom. Robert, Jr., then moved from the bedroom toward the second floor landing. At the top of the stairs, he was on the ground when the defendant inflicted some other injury to him, most likely the defensive wounds to his right arm. Robert, Jr., got up and moved down the stairs where he fell against the wall. He was still standing when he reached the bottom of the stairs and the defendant overtook him. At the bottom of the stairs, the defendant stabbed him in the right side of the neck, almost severing his carotid artery. At that point Robert, Jr., fell backward onto the stairs, where he bled to death.

The evidence presented to the panel at the second penalty phase hearing was virtually identical to the evi-

dence presented to the jury during the first penalty phase hearing. See id., 221–25. In *Breton II*, we concluded that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant committed both murders in an especially cruel manner. Id. We see no reason to revisit that determination. Accordingly, we conclude, for the reasons stated in *Breton II*, supra, 235 Conn. 223–25, that the state's evidence sufficed as a matter of law to establish that the defendant killed both his former wife and son in an especially cruel manner.[50]

## X

## CLAIM THAT THE CRUEL, HEINOUS AND DEPRAVED AGGRAVATING FACTOR IS UNCONSTITUTIONALLY VAGUE

The defendant next contends that the aggravating factor alleged by the state, that the defendant committed the crimes in an especially heinous, cruel or depraved manner; General Statutes (Rev. to 1995) § 53a-46a (h) (4); is unconstitutionally vague. The defendant argues that this constitutional infirmity results from the vagueness of the term "especially cruel." The state maintains that the defendant is bound by the definition of "especially cruel" set forth in *State* v. *Breton*, 212 Conn. 258, 270, 562 A.2d 1060 (1989) (*Breton I*). The state further contends that the definition of "especially cruel" set forth in *Breton I* exceeds the requirements of the eighth amendment.[51] We agree with the state.

[50] In its brief, the state asserted that we should affirm the defendant's death sentence even if the state only proved that one of the murders was committed in an especially cruel manner. Because we conclude that the state adduced sufficient evidence to prove beyond a reasonable doubt that both murders were committed in an especially cruel manner, we need not reach this issue.

[51] "Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion . . .

As a preliminary matter, we address the reviewability of this claim. The defendant concedes that he did not preserve this claim but asserts that it is reviewable under the *Golding* doctrine; see *State* v. *Golding,* supra, 213 Conn. 239–40; see also part III of this opinion; the plain error rule and the "special capital reviewability rule." We review the defendant's claim under the *Golding* doctrine because the record is adequate for review and because the claim is of constitutional magnitude.[52] We also note that the state has not argued that the claim is unreviewable and has briefed the claim on its merits. We conclude, however, that the defendant's claim fails under the third prong of *Golding.*

In support of his claim that the term "especially cruel" is unconstitutionally vague, the defendant argues that this court does not have the power to define a facially vague aggravating factor and that the legislature alone has the power to define "especially cruel." This claim was raised and rejected in *Breton I,* supra, 212 Conn. 268–69. In that case, we concluded that the "especially cruel" aggravating factor was unconstitutionally vague and undertook to put a judicial gloss upon the term to save it "from its facial vagueness and yet [construe] it as narrowly as possible in the defendant's favor." Id., 269–70. The defendant had asserted that we did not have the authority to adopt such a definition, citing *State* v. *Ellis,* 197 Conn. 436, 455–56, 497 A.2d 974 (1985), on appeal after remand sub nom. *State* v. *Paradise,* 213 Conn. 388, 567 A.2d 1221 (1990), for the proposition

held invalid in *Furman* v. *Georgia* [408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)] . . . . As in *Maynard* [v. *Cartwright,* 486 U.S. 356, 361–62, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)], the more stringent eighth amendment principles control this case, except to the extent that due process principles further enlighten our analysis." (Citation omitted; internal quotation marks omitted.) *Breton I,* supra, 212 Conn. 264 n.6.

[52] Specifically, a challenge to an aggravating factor on vagueness grounds implicates the eighth and fourteenth amendments. *Breton I,* supra, 212 Conn. 264 n.6.

that "the power to define crimes and to designate the penalties therefor resides in the legislature." *Breton I,* supra, 268. We rejected this contention, and construed the term "especially cruel" to mean "the intentional infliction of extreme pain or torture above and beyond that necessarily accompanying the underlying killing."[53] Id., 270.

The defendant in the present case now asks us to revisit the question of whether we have the power to define the term "especially cruel" or whether that function is a power reserved to the legislature alone. The defendant, however, has offered no compelling reason to revisit this issue. Accordingly, we reaffirm our holding in *Breton I.*

The defendant's second contention is that, even if it is assumed that we have the power to put a gloss on statutes, the definition of "especially cruel" that we adopted in *Breton I* is unconstitutionally vague because it provides too subjective a standard. The defendant concedes, however, that this argument was raised and rejected in *Breton II,* supra, 235 Conn. 217–18, and *State* v. *Ross,* supra, 230 Conn. 255–56.[54] Again, the defendant

[33] We further noted that such definition "comports with, and indeed is somewhat narrower than, the common definition of 'cruel' . . . [and] such an objective judicial gloss protects the term 'especially cruel' from attack on vagueness grounds." *Breton I,* supra, 212 Conn. 270.

[34] In *Breton II,* supra, 235 Conn. 218, the defendant asserted that, despite the judicial gloss placed on the term " 'especially cruel' " in *Breton I,* our capital sentencing scheme was unconstitutional because it "allows the state to establish an impermissibly vague aggravating factor, namely, that the defendant committed the offense in an 'especially cruel manner' . . . ." Id., 217. Relying on our holding in *State* v. *Ross,* supra, 230 Conn. 183, we "reject[ed] the defendant's challenges to our capital sentencing scheme . . . because . . . the judicial gloss that we placed upon the term 'especially cruel' in [*Breton I,* supra, 212 Conn. 270–71] . . . saves that aggravating factor from constitutional infirmity." *Breton II,* supra, 218.

*State* v. *Ross,* supra, 230 Conn. 255, involved, among other claims, a vagueness challenge to the aggravating factor " 'in an especially heinous, cruel or depraved manner.' " We concluded in *Ross* that this factor, when properly limited by the judicial gloss placed upon it in *Breton I,* was not unconstitutionally vague. Id., 255–56.

has provided no compelling reason to revisit the issue here. Accordingly, we reaffirm our constitutional holdings in those cases. Because we conclude that the term "especially cruel" is not unconstitutionally vague, the defendant's claim fails under the third prong of *Golding*.

## XI

## CLAIM THAT § 53a-46a (d) IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED

The defendant next claims that our capital sentencing statute is unconstitutional on its face and as applied because it requires that the mitigating nature of nonstatutory mitigating factors must be determined "considering all the facts and circumstances of the case. . . ." General Statutes (Rev. to 1995) § 53a-46a (d). The state contends that this challenge to the "facts and circumstances" language of the capital sentencing statute already has been rejected by this court and we should not revisit the issue. We agree with the state.

The defendant first contends that the facts and circumstances language is "broad and all encompassing . . . plac[ing] no meaningful limit on what . . . the sentencer may consider when rejecting a proven mitigating fact." This claim is virtually identical to a claim that we considered and rejected in *Cobb II*, supra, 251 Conn. 482–86. In that case, the defendant challenged the facts and circumstances language of § 53a-46a (d) on vagueness grounds and asked that the sentencer be given a limiting instruction or that the language be stricken. Relying on *Buchanan* v. *Angelone*, 522 U.S. 269, 275–77, 118 S. Ct. 757, 139 L. Ed. 2d 702 (1998),[55]

---

[55] "In *Buchanan* v. *Angelone*, [supra, 522 U.S. 275–77], the United States Supreme Court stated: [O]ur cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. . . . In the eligibility phase, the [sentencer] narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. . . . In the selection phase, the [sentencer] determines whether to impose a death sentence on an eligible defendant. . . . It is in regard to the eligibility phase that we have stressed the need

we concluded that the "eighth amendment vagueness analysis applies only to the eligibility phase and not to the selection phase of the sentencing hearing of a capital felony trial." *Cobb II*, supra, 251 Conn. 484. Moreover, we concluded that "[i]t is equally well settled that the federal constitution permits a capital sentencer to consider the circumstances of the crime in deciding whether to impose the death penalty." (Internal quotation marks omitted.) Id., 485. We rejected the defendant's vagueness challenge because, under our statute, the capital sentencer is directed to consider the facts and circumstances of the case during the selection phase of capital sentencing where the eighth amendment vagueness doctrine is not applicable. Id., 483. The defendant in the present case asks us to reexamine this holding. Once again, however, the defendant provided us no compelling reason for us to do so. Accordingly, we reaffirm our holding in *Cobb II*.

The defendant also claims, however, that use of the facts and circumstances language in the present case impermissibly transformed the capital sentencing statute into a weighing statute and deprived the defendant of meaningful appellate review. This claim also was

for channeling and limiting the [sentencer's] discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. . . .

"In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. . . . However, the state may shape and structure the [capital sentencer's] consideration of mitigation so long as it does not preclude the [sentencer] from giving effect to any relevant mitigating evidence. . . . Our consistent concern has been that restrictions on the . . . sentencing determination not preclude the [sentencer] from being able to give effect to mitigating evidence. . . . [O]ur decisions suggest that [at the selection phase], complete . . . discretion is constitutionally permissible." (Citations omitted; internal quotation marks omitted.) *Cobb II*, supra, 251 Conn. 483–84.

raised and rejected in *Cobb II*, where the defendant, "[i]mpliedly raising a statutory rather than a constitutional claim . . . argue[d] that, because § 53a-46a is not a balancing statute, it precludes a capital sentencer from considering evidence regarding aggravation at the selection phase of the penalty hearing." Id., 486 n.101. We rejected this argument, stating that "we can discern nothing inconsistent between the statutory provision that directs a capital sentencer to consider all of the facts and circumstances of the case in determining whether a particular factor is in fact mitigating in nature . . . and the statutory requirement that, once a particular factor has been found to be mitigating in nature, the capital sentencer may not balance that mitigating factor against the proven aggravants, but instead must impose a sentence of life without possibility of release. . . . A [sentencer] that is entrusted with the awesome responsibility for deciding whether the death penalty should be imposed cannot be asked to find facts in a vacuum." (Citations omitted; internal quotation marks omitted.) Id.

Finally, the defendant argues that § 53a-46a (d) renders the capital sentencer's findings on mitigating factors unreviewable. This claim also was considered by this court in *Breton II*, supra, 235 Conn. 217. Relying on our holding in *Ross*, where we had rejected an identical claim, we concluded that § 53a-46a (d) "does not render the capital sentencer's findings on mitigating factors unreviewable, or standardless and arbitrary." Id., 218; see also *State* v. *Ross*, supra, 230 Conn. 281–84. We see no reason to revisit the issue, and reaffirm our holdings in *Breton II*, *Ross* and *Cobb II*.

## XII

## OTHER CONSTITUTIONAL CHALLENGES

Finally, the defendant raises an array of constitutional challenges to our capital sentencing scheme. Spe-

cifically, the defendant claims that our capital sentencing scheme is unconstitutional because: (1) it fails to provide for a sentencer who is empowered to make an individualized determination that death is the appropriate punishment; (2) it imposes a mandatory death sentence on the defendant by not allowing the sentencer to reject the death penalty if the sentencer finds an aggravating factor but no mitigating factor; (3) the defendant has the burden of proving the existence of a mitigating factor by a preponderance of the evidence; (4) it embodies a presumption of death; and (5) it is per se unconstitutional under the Connecticut constitution.

The defendant concedes that we have considered and rejected each of these constitutional challenges multiple times.[56] He asks us, nonetheless, to reconsider

[56] In regard to the defendant's first constitutional claim, that our capital sentencing scheme fails to provide for a sentencer who is empowered to make an individualized determination that death is the appropriate punishment, we rejected an identical claim in *State* v. *Ross*, supra, 230 Conn. 253. In *Ross*, we concluded that our death penalty scheme "provides the capital sentencer with sufficient latitude to make a reasoned moral and individualized determination, based on the defendant's background, character and crime, that death is the appropriate punishment." Id. We subsequently reaffirmed this holding in *Breton II*, supra, 235 Conn. 217–18, in *State* v. *Webb*, supra, 238 Conn. 412, and in *Cobb II*, supra, 251 Conn. 496–97.

In regard to the defendant's second constitutional claim, that our capital sentencing scheme imposes a mandatory death sentence on the defendant by not allowing the sentencer to reject the death penalty if the sentencer finds an aggravating factor but no mitigating factor, we rejected an identical claim in *State* v. *Ross*, supra, 230 Conn. 241. In *Ross*, we concluded that our capital sentencing scheme is not impermissibly mandatory because "our capital sentencing statutes, on their face, give the capital sentencer, either a jury or the court, the proper amount of guided discretion to make the appropriate determination regarding the individual defendant with regard to the defendant's specific crime." Id. We subsequently reaffirmed this holding in *Breton II*, supra, 235 Conn. 217–18, and in *Cobb II*, supra, 251 Conn. 496–97.

In regard to the defendant's third constitutional claim, that under our capital sentencing scheme the defendant has the burden of proving the existence of a mitigating factor by a preponderance of the evidence, we rejected an identical claim in *State* v. *Ross*, supra, 230 Conn. 254–55. We

our holdings in *Cobb II*, supra, 251 Conn. 496–97, *State* v. *Webb*, supra, 238 Conn. 412, *Breton II*, supra, 235 Conn. 217–18, and *State* v. *Ross*, supra, 230 Conn. 241, 249–55, on each of these issues. We decline to do so, and reaffirm our holdings in those cases.

## XIII

## PROPORTIONALITY REVIEW

We next undertake the appellate function of proportionality review. "Pursuant to General Statutes (Rev.

noted in that case that, "[w]ith regard to the burden of proof claim concerning the mitigating factors, the United States Supreme Court in *Walton* v. *Arizona*, [497 U.S. 639, 650, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), overruled on other grounds, *Ring* v. *Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002)], stated: 'So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances . . . .' " *State* v. *Ross*, supra, 241–42 n.24. We subsequently reaffirmed this holding in *Breton II*, supra, 235 Conn. 217–18, and in *Cobb II*, supra, 251 Conn. 496–97.

In regard to the defendant's fourth constitutional claim, that our capital sentencing scheme embodies a presumption of death, we rejected an identical claim in *State* v. *Ross*, supra, 230 Conn. 241. We concluded in that case that, "[w]ith regard to the presumption of death claim, the court [in *Walton* v. *Arizona*, supra, 497 U.S. 651–52] determined that there is no unconstitutional presumption of death as long as the requirements of individualized sentencing are satisfied in death penalty cases by allowing the sentencer to consider all relevant mitigating evidence. . . . Our statute allows such consideration." (Citation omitted.) *State* v. *Ross*, supra, 241–42 n.24. We subsequently reaffirmed this holding in *Breton II*, supra, 235 Conn. 217–18, and in *Cobb II*, supra, 251 Conn. 496–97.

In regard to the defendant's fifth constitutional claim, that our capital sentencing scheme is per se unconstitutional under the Connecticut constitution, we rejected an identical claim in *State* v. *Ross*, supra, 230 Conn. 249–52. We concluded in that case that "the due process clauses of our state constitution incorporate the principles underlying a constitutionally permissible death penalty statute that the United States Supreme Court has articulated . . . . These principles require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to assure that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular

to 1991) § 53a-46b (a), this Court is responsible for reversing [a]ny sentence of death imposed in accordance with the provisions of [§] 53a-46a . . . . In carrying out this function, the legislature has directed us to affirm the sentence of death unless [we determine] that . . . the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. General Statutes [Rev. to 1991] § 53a-46b (b) (3). Under § 53a-46b (b) (3), therefore, we must engage in what has come to be known as proportionality review of the defendant's death sentence. [*State* v. *Webb*], supra, 238 Conn. 490–91.

"As we previously have stated, our function in undertaking [proportionality review] is to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition. . . . The search, however, is not for a case involving a rough equivalence of moral blameworthiness; the search is, rather, for a gross disparity between the case on review and other cases within the selected pool of similar cases. . . . Thus, proportionality review requires a comparison of the decision to impose a death sentence, made by the fact finder in the case before us on the basis of the presence or absence of aggravating and mitigating factors, with decisions to impose sentences of death or life imprisonment, made by the fact finders in the other relevant cases on the basis of the presence or absence of aggravating and mitigating factors. That process requires us

offense. Our death penalty statute, § 53a-46a, meets these minimum state constitutional law requirements." (Citations omitted.) Id., 252. We subsequently reaffirmed this holding in *Breton II*, supra, 235 Conn. 217–18, and in *Cobb II*, supra, 251 Conn. 496–97.

to determine whether, as compared to those cases, this case is an outlier. . . . *Cobb II*, supra, 251 Conn. 509–10. In other words, because [t]he process of proportionality review requires that we canvass a set of similar cases to determine whether the death penalty in the case before us was, with respect to that set of cases, wantonly or freakishly imposed by the fact finder. [*State* v. *Webb*], supra, 238 Conn. 516. We will not vacate a death sentence as disproportionate under § 53a-46b (b) (3) unless that sentence is truly aberrational with respect to similar cases. See id., 501." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 237–39.

As a preliminary matter, we address the state's claim that the defendant is not entitled to proportionality review because his sentencing hearing was held in 1997, two years after the statute mandating proportionality review was repealed. See Public Acts 1995, No. 95-16, § 3 (b) (P.A. 95-16). The defendant contends that his case was still pending when the repealing statute was enacted and, therefore, that he is entitled to proportionality review. We agree with the defendant.

The essential facts are not in dispute. The defendant committed the crimes for which he was convicted on December 13, 1987. After the first penalty phase hearing, the defendant was sentenced to death on April 11, 1989. He then appealed to this court. On April 12, 1995, P.A. 95-16, § 3 (b), took effect, thereby repealing proportionality review. On August 22, 1995, this court reversed the defendant's death sentence and remanded the case to the trial court for a second penalty phase hearing. On April 23, 1997, after the defendant's second penalty phase hearing, the panel delivered its special verdict, finding that the state had proved the aggravating factor beyond a reasonable doubt and that none of the factors claimed by the defendant, either alone or in combina-

tion, constituted a mitigating factor. The panel imposed the death sentence on January 9, 1998.

The defendant contends that he is entitled to proportionality review pursuant to *Cobb I*, *Webb* and *Cobb II*. In *Cobb I*, we concluded that although P.A. 95-16, § 3 (b), repealed proportionality review, proportionality review "is still mandatory for all capital felony cases pending at the time that the repealing statute became effective." *Cobb I*, supra, 234 Conn. 746 n.10; see id., 737–38 n.2 (noting that P.A. 95-16 eliminated proportionality review on prospective basis); see also *Cobb II*, supra, 251 Conn. 501–502; *State* v. *Webb*, supra, 238 Conn. 491 n.71. The state contends, however, that this case is distinguishable from *Cobb I*, *Webb* and *Cobb II* because, unlike the penalty phase hearings in those cases, the defendant's second penalty phase hearing in the present case took place subsequent to the enactment of the repealing statute. We agree with the defendant.

In *Cobb I*, *Webb* and *Cobb II*, we determined that capital felony defendants whose cases were pending at the time the repealing statute was enacted were still entitled to proportionality review. Thus, we recognized that P.A. 95-16, § 3 (b), was not retroactive. This is in accord with the well established principle that "[i]n criminal cases . . . we generally have applied the law in existence on the date of the offense, regardless of its procedural or substantive nature." (Internal quotation marks omitted.) *State* v. *Parra*, 251 Conn. 617, 633, 741 A.2d 902 (1999) (*Berdon, J.*, dissenting); *In re Daniel H.*, 237 Conn. 364, 377, 678 A.2d 462 (1996); see also *State* v. *Millhouse*, 3 Conn. App. 497, 501, 490 A.2d 517 (1985) (in construing penal statute to determine whether application is retroactive, date of crime controls). Accordingly, the fact that the defendant's penalty phase hearing took place after the repeal of § 53a-46b (b) (3) is irrelevant to a determination of whether the defendant is entitled to proportionality review. Rather,

the date of the defendant's crime is determinative. Because the defendant's crime was committed before the date of the repealing statute, he is entitled to mandatory proportionality review.

We next address the question of what cases should be included within the pool of similar cases for purposes of our review. "In accordance with the statutory mandate of § 53a-46b (a) that we review all sentences of death 'pursuant to [our] rules,' we adopted Practice Book § [67-6 (b)],[57] under which we defined the universe

---

[57] Practice Book § 67-6 provides: "(a) When a sentence of death has been imposed upon a defendant, following a conviction of a capital felony in violation of General Statutes § 53a-54b and the hearing upon imposition of the death penalty pursuant to General Statutes § 53a-46a, the briefs of the parties shall include a discussion of the issues set forth in General Statutes § 53a-46b (b), to wit, whether (1) the sentence was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of an aggravating circumstance specified in subsection (h) of § 53a-46a; and (3) the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

"(b) For the purpose of reviewing the issue of disproportionality pursuant to General Statutes § 53a-46b (b), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as 'similar cases,' unless the court, on application of a party claiming that the resulting pool of eligible cases is inadequate for disproportionality review, shall modify this limitation in a particular case. Any such application shall identify the additional case or cases claimed to be similar and set forth, in addition to the circumstances of the crime and the character and record of the defendant involved, the provisions of the applicable statutes pertaining to the imposition of the death penalty with citations of pertinent decisions interpreting such provisions.

"Any such application shall be filed within thirty days after the delivery date of the transcript ordered by the appellant, or, if no transcript is required or the transcript has been received by the appellant prior to the filing of the appeal, such application shall be filed within thirty days after filing the appeal."

[of similar cases] as follows: 'Only those capital felony cases that have been prosecuted in this state after October 1, 1973, and in which hearings on the imposition of the death penalty have taken place, whether or not the death penalty has been imposed, shall be deemed eligible for consideration as "similar cases" . . . .' " *State* v. *Webb*, supra, 238 Conn. 513. Since adopting Practice Book § 67-6, we have recognized that the universe includes those capital felony cases that have proceeded to a hearing on the death penalty but are "currently on appeal and, absent exceptional circumstances wholly undermining the fundamental reliability of the fact-finding process, cases that have been reversed on appeal." Id., 528. The pool of similar cases with which the case under review must be compared is then drawn from this universe.

In *State* v. *Webb*, supra, 238 Conn. 525, we recognized that "[t]here is no hard and fast rule or definition of 'similar cases' that will be satisfactory . . . in all cases." We also recognized, however, that "the cases of any other defendants who were convicted [under the same subsection of the capital felony statute], as was this defendant, would be 'similar cases' to this case." Id., 526. We further recognized that the class of similar cases was not "intended to be cabined by the particular subsections of the capital felony statute"; id.; but also includes "cases in which the defendants engaged in substantially similar conduct." Id., 525–26.

The state and the defendant agree on the following pool of similar cases culled from the appropriate universe of cases:[58] *State* v. *Griffin*, 251 Conn. 671, 741

[58] Both the state and the defendant agree that *State* v. *Oritz*, 252 Conn. 533, 747 A.2d 487 (2000), is a similar case. We conclude, however, that as to one codefendant in that case, Angel Luis Ortiz, the case is not a similar case, and as to the other codefendant, Julio Diaz-Marrero, the parties have not provided us with sufficient information to engage in a meaningful comparison with the present case.

In *Ortiz*, the two codefendants were tried jointly, and each was convicted of three counts of capital felony. Id., 536. The case proceeded to a joint

penalty phase hearing. During the penalty phase hearing, the court learned that Ortiz was planning to introduce evidence that Diaz-Marrero was a hired killer. The court bifurcated the penalty phase hearing, proceeding against Diaz-Marrero and postponing Ortiz' hearing. The jury found with respect to Diaz-Marrero that the state had proved an aggravating factor for all three capital felony counts. The jury could not reach a unanimous conclusion on the existence of a mitigating factor. The court then proceeded with the penalty phase hearing against Ortiz. Before any findings were made by the jury with regard to Ortiz, the state elected not to pursue a rehearing in the case of Diaz-Marrero and to withdraw the death penalty against Ortiz.

We conclude that, because Ortiz' case did not proceed to a penalty phase hearing, it should not be included in the universe of similar cases. We also conclude that, although Diaz-Marrero's case did proceed to penalty phase hearing, the parties have not provided us with the mitigating factors that Diaz-Marrero alleged, and review of the record available to this court does not reveal them.

Practice Book § 67-6 (b) provides in relevant part: "For the purpose of reviewing the issue of disproportionality pursuant to . . . § 53a-46b (b), the briefs of the parties shall contain appendices setting forth the circumstances of the crimes that are claimed to be similar to that of which the defendant has been convicted and the characters and records of the defendants involved therein so far as these are ascertainable from the transcripts of those trials and hearings on the imposition of the death penalty or may be judicially noticed. . . ." We require that the parties provide us with information regarding the similar cases so that we can engage in a meaningful comparison of the case before us with the claimed similar cases. Here, the parties have not provided us with any information regarding the penalty phase for either Diaz-Marrero or Ortiz. We independently have reviewed the records available to this court, but we have been unable to determine the mitigating factors claimed by Diaz-Marrero. Without knowledge of the mitigating factors claimed by Diaz-Marrero, this court is unable to engage in a meaningful comparison of Diaz-Marrero's case with this case.

In addition, the state, in its brief, points out that since the time that the defendant filed his brief, the case of *State* v. *Peeler*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CR 99-0148396, proceeded to a penalty phase hearing and thus could be considered similar for the purposes of proportionality review. The state contends, however, that because the *Peeler* case was prosecuted under the post-1995 capital sentencing scheme, which mandates that the sentencer weigh the mitigating factors against the aggravating factor, *Peeler* would be of limited relevance to this case. The defendant does not appear to contest that *Peeler* is a similar case, but instead points out that the state has not provided us with enough information to compare *Peeler* to the present case. We conclude that neither party has provided us with sufficient information to engage in a meaningful comparison of *Peeler* with the present case.

A.2d 944 (1997); *State* v. *Day*, 233 Conn. 813, 661 A.2d 539 (1995);[59] *State* v. *Roseboro*, 221 Conn. 430, 604 A.2d 1286 (1992); *State* v. *Steiger*, 218 Conn. 349, 590 A.2d 408 (1991); *State* v. *Wood*, 208 Conn. 125, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988); *State* v. *Daniels*, supra, 207 Conn. 374.

The state and the defendant disagree, however, about whether *Breton II*, supra, 235 Conn. 206, and *State* v. *Ross*, supra, 230 Conn. 183, should be included in the pool of similar cases. The state contends that both cases are similar cases for purposes of proportionality review. The defendant contends that: (1) the pool of similar cases should not include earlier appeals of his own case; and (2) *Ross* is not a similar case because the defendant in that case did not engage in substantially similar conduct. We conclude that the defendant's first penalty phase hearing is not a similar case for purposes of proportionality review. We also conclude that the defendant in *Ross* engaged in substantially similar conduct and, therefore, that that case is a similar case.

We first address the state's claim that the defendant's sentence after his first penalty phase hearing should be treated as a similar case for comparison purposes because we concluded in *State* v. *Webb*, supra, 238 Conn. 522, that "prior cases that have been reversed on appeal should, absent exceptional circumstances, be included in the universe of cases." We conclude that the state reads our holding in *Webb* too broadly. *Webb* simply did not address the question of whether a prior reversed sentence in the *same* case should be included in the

---

[59] The defendant points out that the state did not include *State* v. *Day*, supra, 233 Conn. 813, in the list of cases that the state agreed were similar to the present case. The defendant contends that this was merely an oversight because the state does not object to the inclusion of *Day* and discusses *Day* among the cases to which it agrees. We agree with the defendant; the state's failure to include *Day* in the list of similar cases to which both parties agree appears to be an oversight.

universe of similar cases, much less whether it should be included in the ultimate pool of cases to be considered for comparison purposes.

Although we recognize that inclusion of the defendant's first sentence in the class of similar cases could provide "additional insight into patterns or trends of sentencers"; id., 522; we conclude for the following reasons that it should not be included. First, the state has pointed to nothing in the language of § 53a-46b (b) or in its legislative history to suggest that the legislature intended for the phrase "similar cases," as used in that statute, to include reversed sentences in the case under review. In ordinary usage, and as a matter of common sense, the word "similar" does not mean "same" or "identical." Moreover, we note that the potential for multiple death sentences and reversals in a given case automatically could provide the state with a set of "similar cases" in which the death penalty had been imposed, with no corresponding potential benefit to defendants. Thus, inclusion of all such reversed sentences in the pool of similar cases would provide an asymmetrical benefit to the state. Accordingly, we reject the state's claim that the defendant's reversed sentence in this case is a similar case for purposes of § 53a-46b (b).

We next address the state's contention that *State* v. *Ross*, supra, 230 Conn. 183, is a similar case. The state points out that the defendant in that case originally was charged with one count of multiple homicide pursuant to § 53a-54b (8) along with seven other counts of capital felony.[60] The state contends that, although the multiple

[60] The defendant in *Ross* originally was charged with eight counts of capital felony involving four murders. *State* v. *Ross*, supra, 230 Conn. 188 n.2, 191–92. The conduct that the state claims is similar to the defendant's case involves two of the victims in *Ross*. The defendant in that case kidnapped those two victims in Connecticut and transported them to Rhode Island, where he sexually assaulted and murdered one and murdered the other. Id., 192. In connection with that conduct, the defendant was charged with two counts of kidnap murder, one count of murder, one count of sexual assault murder and one count of multiple murder. The sexual assault murder count and the

murder charge ultimately was dismissed for lack of territorial jurisdiction, because the sentencer sentenced the defendant to death for the two kidnap murders that were the basis for the multiple homicide count, it can be inferred that the sentencer would have sentenced the defendant to death for the multiple homicide as well. The defendant in this case contends that the defendant in *Ross* did not engage in substantially similar conduct and the only similarity between the defendant's case and *Ross* is the fact that there were multiple victims.

We conclude that the underlying conduct in *Ross* "is substantially similar, in its criminal characteristics, to that of the defendant in [this] case . . . ." *State* v. *Webb*, supra, 238 Conn. 525. The dismissal of the multiple murder count in *Ross* for lack of territorial jurisdiction does not alter the underlying character of the criminal conduct in that case, namely, the murder of two persons during the course of a single transaction, or deprive it of its basic similarity to the defendant's conduct in this case. As we have noted, similar cases are not "cabined by the particular subsection of the capital felony statute." Id., 526. Accordingly, the fact that the two murders in *Ross* were prosecuted under a different subsection of the capital felony statute does not preclude consideration of *Ross* as a similar case for purposes of proportionality review.

---

multiple murder count both were dismissed for lack of territorial jurisdiction because the criminal conduct took place in Rhode Island. Id., 188 n.2, 194. We concluded, however, that the trial court properly had jurisdiction over the two kidnap murder counts underlying the multiple murder charge. Id., 194–202.

In *State* v. *Webb*, supra, 238 Conn. 539–40 n.93, and *Cobb II*, supra, 251 Conn. 510 n.114, we treated the convictions in *Ross* as four separate cases for purposes of proportionality review because the defendant had been convicted of four separate sexual assault murders. In this case, we treat *Ross* as a single similar case because the defendant initially was charged with only one violation of § 53a-54b (8).

We now turn to a review of the facts of the similar cases. The defendant in this case was found guilty of multiple murder capital felony in violation of § 53a-54b (8) for the deaths of his former wife and his son. Following the penalty phase hearing before a three judge panel, the defendant was sentenced to death. The panel found that the state had proved its aggravating factor, that the murders were committed in an especially cruel manner. See General Statutes (Rev. to 1995) § 53a-46a (h) (4). This finding was based on evidence demonstrating that the defendant had engaged in a prolonged and violent assault on his former wife, during which he beat her severely and stabbed her multiple times, ignoring her anguished cries that he was hurting her and begging for help. The defendant then turned on his son, chased him down as he attempted to escape and repeatedly stabbed him.

The defendant claimed the two statutory mitigating factors of significant impairment of his mental capacity and significant impairment of his ability to conform his conduct to the requirements of the law as well as twenty-five nonstatutory mitigating factors.[61] As we previously have noted in this opinion, the panel found that the defendant had proved the factual underpinnings of four nonstatutory mitigating factors. They were: (1) that the defendant was neglected, abandoned and the product of an abusive family unit during his childhood; (2) that the defendant had been a model prisoner at all times since his incarceration for the murders; (3) that he dropped out of school at age sixteen; and (4) that he was a good employee and a productive worker. The panel further found, however, that none of the nonstatutory mitigating factors, alone or in combination, constituted a mitigating factor considering all of the facts and circumstances of the case. Accordingly, the panel sentenced the defendant to death.

---

[61] See footnote 7 of this opinion.

In *State* v. *Griffin*, supra, 251 Conn. 671, the defendant was convicted of one count of capital felony in violation of § 53a-54b (8) and two counts of murder in violation of § 53a-54a. On November 1, 1993, the defendant and another individual, Gordon "Butch" Fruean, Jr., entered the home of the defendant's former girlfriend. Id., 678. While there, the defendant and Fruean attacked two individuals. The defendant shot each victim, one of them multiple times. Upon realizing that the victims were still alive, the defendant stabbed them both multiple times. Id., 679. Again realizing that the victims were still alive, the defendant smashed a glass mason jar over one victim's head and a ceramic lamp over the other victim's head. Id.

The state, at the defendant's penalty phase hearing, sought to prove the aggravating factor that the defendant had committed the murders in an especially heinous, cruel or depraved manner. The defendant claimed twenty mitigating factors.[62]

---

[62] These were: (1) the role and actions of Fruean remain uncertain; (2) the defendant had no record of criminal activity other than a juvenile matter; (3) there was no evidence that the defendant had a violent nature other than the crime for which she was convicted; (4) the defendant had been a productive member of society for thirty years; (5) the defendant was an active and involved mother; (6) the defendant was a loving and devoted grandmother; (7) the defendant took handicapped children into her home for visits; (8) the defendant took care of a profoundly retarded child, making the child part of the defendant's family; (9) the defendant welcomed her children's friends into her home when they were in need; (10) the defendant was a hard worker and provided financial support to her family; (11) the quality of the defendant's work with the handicapped; (12) the defendant went back to school to earn her high school degree and attend college after raising her children; (13) the defendant's voluntary involvement in community activities; (14) the defendant's generous dealings with others; (15) the defendant's background, character and history suggest that she is unlikely ever to be a violent threat to others in the future; (16) the defendant provides positive contributions to the lives of her children, grandchildren and friends; (17) the nature of the defendant's crimes is so out of character that a death sentence would be inappropriate; (18) a factor concerning the nature of the crime that in fairness or mercy constitutes a basis for a life sentence; (19) a factor concerning the defendant's character, history or background that in fairness or mercy constitutes a basis for a life sentence;

The jury returned a special verdict finding that the state had proved the aggravating factor beyond a reasonable doubt for both of the murders. Id., 681–82. The jury further found that the defendant had proved the existence of an unspecified mitigating factor or factors. Id., 682. The trial court imposed a sentence of life imprisonment without the possibility of release. Id.

In *State* v. *Correa*, supra, 241 Conn. 324 n.1, 325–27, the defendant was convicted of one count of multiple murder capital felony in violation of § 53a-54b (8)[63] for the shooting deaths of two drug dealers. At the penalty phase hearing, the jury found that the state had proved the existence of an aggravating factor, that the defendant committed the felony in expectation of the receipt of something of pecuniary value, as set forth in § 53a-46a (h) (6).[64] The defendant claimed twenty-one mitigating factors.[65] The jury found that the defendant had proved

and (20) the combination of any or all of the factors, in fairness or mercy, provides a reason for sentencing the defendant to life in prison.

[63] "The defendant was convicted of one count each of conspiracy to commit capital felony in violation of General Statutes §§ 53a-48 and 53a-54b (8), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, capital felony in violation of General Statutes § 53a-54b (8), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48, 53a-133 and 53a-134 (a) (1) (2), robbery in the first degree in violation of General Statutes §§ 53a-133 and 53a-134 (a) (1) (2), possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), and attempt to escape in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-169 (a) (1), and of two counts each of murder in violation of General Statutes § 53a-54a (a), and felony murder in violation of General Statutes § 53a-54c." *State* v. *Correa*, supra, 241 Conn. 324 n.1.

[64] Originally the state also had intended to prove that the defendant committed the crime in an especially heinous, cruel or depraved manner pursuant to § 53a-46a (b) (4), but it dropped this factor during the penalty phase hearing.

[65] These were: (1) the defendant was criminally liable as an accessory and his participation in the offense was relatively minor; (2) the defendant was not the one who shot the victims; (3) there remains a lingering doubt as to whether the defendant shot the victims; (4) the defendant's formal education ended in the fifth grade; (5) the defendant had a history of steady employment; (6) the defendant worked hard to support his family and improve their economic situation; (7) the defendant was a good man and a loving

an undetermined mitigating factor, and the defendant was sentenced to life in prison. Id., 324.

In *State* v. *Day*, supra, 233 Conn. 813, 815–16, the defendant was convicted of four counts of murder in violation of § 53a-54a and one count of multiple murder capital felony in violation of § 53a-54b (8) for the shooting deaths of four individuals, one of whom was a five year old child. Id.

The state sought to prove the aggravating factor that the defendant had committed the crime in an especially heinous, cruel or depraved manner. The state presented testimony that one of the adult victims died from multiple gunshot wounds to the head, all fired at close range, and evidence from the trial indicated that the defendant repeatedly kicked that individual, probably while he was unconscious. The state offered further testimony indicating that the cause of death for a second adult victim was multiple gunshot wounds to the head and chest, any one of which could have caused her death. The state offered testimony regarding the third adult victim indicating that she was killed by two gunshot wounds to the head, both fired at close range and capa-

husband; (8) the defendant was the father of two young children; (9) the defendant has helped to support his family since childhood; (10) the defendant has no prior record of criminal convictions in Colombia; (11) the defendant was a member of a large, close, loving and supportive family; (12) the defendant had positive relationships with his family, who have indicated that they would support him if he was incarcerated; (13) the allure of the illicit drug trade significantly influenced the defendant's judgment; (14) the defendant wrote letters for his sister and another individual claiming ownership of cocaine found at their apartment; (15) the victims were drug dealers who knowingly and voluntarily involved themselves in a violent and dangerous business; (16) the defendant came from a poor and humble household; (17) during the months of separation from his family the defendant exhibited weaknesses in his personality that had not been exhibited in Colombia; (18) fairness; (19) mercy; (20) a factor in the defendant's character, background or history or the nature or circumstances of the crime that constitutes a basis for a life sentence; and (21) the cumulative effect of all of the mitigating evidence.

ble of causing her death. There was additional evidence suggesting that that victim had been strangled and struck in the head with a shovel, most likely after she was unconscious or dead. Finally, the state offered testimony indicating that the child victim was murdered by a single gunshot wound to the back of the head, killing him almost instantly.

At the close of state's evidence, the defendant moved to dismiss the penalty phase hearing and moved for imposition of a life sentence. The trial court found that the state had not presented a prima facie case from which the jury reasonably could infer that the aggravating factor had been proved by the state, and it granted the defendant's motion to dismiss and motion for imposition of a life sentence.

In *State* v. *Roseboro*, supra, 221 Conn. 430, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8), three counts of murder in violation of § 53a-54a (a); and one count of first degree burglary in violation of General Statutes § 53a-101 (a) (1) and (2). "The defendant, armed with a dangerous weapon and intending to commit a larceny, unlawfully entered and remained in a house in Derby owned by Mary Ferrara. In the course of committing this crime, the defendant engaged in a struggle with Mary Ferrara and intentionally killed her. The defendant also intentionally killed her son Joseph Ferrara and her niece Nina Ferrara. Each of the victims died of stab wounds." Id., 433.

The three judge panel that conducted the penalty phase hearing unanimously found that the state had proved that the crimes were committed in an especially heinous manner. The panel further found a mitigating factor, specifically that the defendant had adjusted well to incarceration, and imposed a life sentence.

In *State* v. *Steiger*, supra, 218 Conn. 349, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8)[66] for the shooting deaths of two individuals. After a verbal altercation with the two victims, which took place near the home of one of the victims, the defendant left the area and proceeded to arm himself with two guns and a knife. He returned to the victim's home, where he shot each victim multiple times and threatened two people standing nearby. Id., 352–56.

The state claimed two aggravating factors: (1) that the defendant committed the murders in an especially heinous, cruel or depraved manner; and (2) that the defendant committed the murders and in such commission knowingly created a grave risk of death to another person in addition to the victims of the offense pursuant to § 53a-46a (h) (3).

In mitigation, the defendant offered testimony that: he had suffered from severe paranoid schizophrenia; he had a mental capacity that was significantly impaired; the mental disorder from which he suffered was prone to worsen under the influence of emotionality; he showed paranoid traits such that he tended to over-interpret threats and to respond explosively to threats; he was an individual of immature emotional development and immature impulse control; he had strong conflicting and unresolved emotions concerning his father and alcoholism; his mental capacity was significantly impaired and he was under substantial duress; he had traumatic childhood experiences that could be characterized as emotional and psychological

[66] The defendant was charged with "two counts of murder in violation of General Statutes § 53a-54a, one count of capital felony in violation of General Statutes § 53a-54b (8), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, and one count of conspiracy to commit capital felony in violation of §§ 53a-48 and 53a-54b (8)." *State* v. *Steiger*, supra, 218 Conn. 350.

abuse; and in describing the events of that night, he appeared to be in a great deal of turmoil and pain.

The three judge panel that conducted the penalty phase hearing unanimously found that the state had proved both aggravating factors. Id., 351. Two of the judges found the existence of a mitigating factor in the defendant's character, background and history and that, at the time of the offense, the defendant's mental capacity was significantly impaired and his ability to conform his conduct to the requirements of the law was significantly impaired. One member of the panel found that the defendant had not proved any mitigating factors. The panel imposed a life sentence without the possibility of parole. Id., 352.

In *State* v. *Wood,* supra, 208 Conn. 125, the defendant was convicted of three counts of murder in violation of § 53a-54a and one count of multiple murder capital felony in violation of § 53a-54b (8). "[O]n the evening of April 16, 1982, the defendant shot and killed his former wife, Rosa Wood, and her boyfriend, George Troie, on Farmington Avenue in West Hartford. The defendant then proceeded to the home on White Pine Lane he had shared with his former wife. Once there he shot and killed his former mother-in-law, Patricia Voli. The defendant then shot and killed his fifteen year old daughter, Elisa Wood." Id., 128.

At the penalty phase hearing, the state sought to prove two aggravating factors: (1) that the defendant committed the murders and in committing them knowingly created a grave risk of death to another person in addition to the victims of the murders; and (2) that the defendant committed the murders in an especially heinous, cruel or depraved manner.

In mitigation, the defendant offered testimony that: he suffered from explosive disorder, major depression and antisocial personality disorder; he suffered from

borderline personality disorder with atypical psychosis; he suffered from a paranoid schizophrenic process; he had a potential for transient psychotic states; he was a good boss, kind man, a good neighbor and was very patient with children; his brother went to see him in prison and would continue to do so; his father was never around; and he became despondent after his separation from his wife.

The jury found that the state had not proved the first aggravating factor, knowingly causing grave risk of death to another. The jury further found that the state had proved that the defendant committed the murders of Voli and Elisa Wood in an especially heinous, cruel or depraved manner. Finally, the jury found that the defendant had proved the mitigating factor that the defendant's mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution. The defendant was sentenced to 120 years in prison. Id.

In *State* v. *Daniels*, supra, 207 Conn. 376–78, the defendant was convicted of multiple murder capital felony in violation of § 53a-54b (8), murder in violation of § 53a-54a and sexual assault in the first degree in violation of General Statutes § 53a-71. Late at night, the defendant entered the home of his girlfriend, where he attacked his girlfriend's roommate and the roommate's three year old child. The defendant stabbed the roommate multiple times in the chest. He then proceeded to strangle the child and slit the child's throat. Then, upon hearing the roommate making gurgling noises, he sexually assaulted her and stabbed her again. Id., 378–79.

At the penalty phase hearing, the jury found that the state had proved the existence of an aggravating factor,

that the defendant had committed the murders in an especially heinous, cruel or depraved manner. In mitigation, the defendant "presented evidence of his deprived home life and mental impairment. According to the defendant's mother, the defendant had grown up in a family atmosphere marked by violence and tragedy. She testified that during his childhood, the defendant had suffered numerous head injuries, had been beaten regularly by his father, who had often been drunk, and had witnessed numerous acts of violence perpetrated by his father on his mother. According to Charles Opsahl, a psychologist, the defendant's childhood difficulties were reflected in current test results that showed his strong depression and his heightened sensitivity to rejection by others. The defendant also presented the testimony of James Merikangus, a psychiatrist, who concluded, after an examination of the defendant, that he suffered from organic brain dysfunction. In addition, the defendant introduced evidence that he had been drinking excessively on the night of the murders and that he had a tendency to get out of control when drinking. On rebuttal, the state called another psychiatrist, Robert Miller, who disagreed with Merikangus' conclusions and diagnosed the defendant as having a mixed personality disorder with antisocial and explosive tendencies." Id., 379–81. The jury could not agree on the existence of a mitigating factor, and the court sentenced the defendant to a term of life imprisonment. Id., 380.

In *State* v. *Ross*, supra, 230 Conn. 183, the defendant was convicted of two counts of capital felony for murder in the course of kidnapping in violation of § 53a-54b (5). The defendant kidnapped two fourteen year old girls and transported them to Rhode Island. While he left one victim in the car, he sexually assaulted and strangled the other. He then returned to the car and strangled the first girl. Id., 192.

At the penalty phase hearing,[67] the state sought to prove that the defendant had committed the murders in an especially heinous, cruel or depraved manner. The jury entered a special verdict form finding that the state had proved this aggravating factor beyond a reasonable doubt as to both murders.

The defendant claimed sixteen mitigating factors, including the two statutory mitigating factors of significant impairment of his mental capacity and significant impairment of his ability to conform his conduct to the requirements of the law.[68] The jury found that the

[67] The state in its brief asserts that we should consider "both *Ross* sentencing hearings" in the present defendant's proportionality review. In *State* v. *Ross*, supra, 230 Conn. 183, we overturned the defendant's first penalty phase hearing and remanded the case for a second penalty phase hearing. After the defendant's second penalty phase hearing, he was again sentenced to death. The state appears to contend that we should consider the sentences imposed after the defendant's first and second penalty phase hearings in *Ross* as two separate cases. We decline to do so. Although we recognize that we concluded in *Webb* that sentences that have been reversed on appeal should be included in the universe of cases from which the pool of similar cases must be drawn, on the ground that even reversed sentences may "provide valuable insight to this court in aid of our task of determining whether a particular death sentence is aberrational"; *State* v. *Webb*, supra, 238 Conn. 521; we did not contemplate including multiple sentences for the same conduct in the same case. For the same reasons that we have concluded that we should not include the prior reversed sentence of the defendant in the present case in the class of similar cases, we conclude that we should include only the latest sentence in cases where there have been multiple sentences. Accordingly, we include only the sentence resulting from the second penalty phase hearing in *Ross* in the class of similar cases.

[68] The fourteen nonstatutory mitigating factors claimed in *Ross* were: (1) he demonstrated remorse; (2) he cooperated with the police; (3) he gave oral and written statements to the state police admitting guilt; (4) he continued to be cooperative with the police giving oral and written statements of guilt in five other homicides; (5) his cooperation was the major factor in solving the homicides in those cases; (6) he has adjusted well to prison and is a good, cooperative and productive inmate; (7) he has positive relationships with others who would suffer if the defendant was executed; (8) he has demonstrated responsibility as a human being and a strong work ethic; (9) the voluntary consumption of medication to help suppress and control the recurrent sexually sadistic urges that are the source of his mental illness; (10) fairness and mercy; (11) he is presently serving two consecutive life

defendant had not proved any mitigating factor for either murder. Accordingly, the defendant was sentenced to death.

We now turn to a comparison of the facts of the present case with the facts of the eight similar cases that we have set forth. In one of the eight similar cases, *State* v. *Ross,* supra, 230 Conn. 183, the sentencer imposed the death penalty; in the remaining cases, the sentencers imposed life sentences.

In *Ross,* as in the present case, the sentencer found that the state had proved the aggravating factor that the defendant had committed each of the two murders in an especially heinous, cruel or depraved manner. The sentencer in *Ross* further found that the defendant had not proved any of the sixteen mitigating factors that he claimed. Eight of the claimed mitigating factors that were rejected in *Ross* were included, either explicitly or in substance, in the claims of mitigation in the present case. Thus, in both *Ross* and the present case, the sentencers consistently rejected these claims of mitigation.

Of the seven similar cases in which the sentencers imposed life sentences, there was one, *Day,* in which the state did not prove its aggravating factor. In that case, the trial court granted the defendant's motion to impose a life sentence at the close of the state's case during the penalty phase hearing. The present case is distinguishable from *Day* on that basis alone.

In two of the seven similar cases in which the sentencers imposed life sentences, *Steiger* and *Daniels,* the state proved its aggravating factor and the sentencers could not agree on whether there was a mitigating fac-

sentences; (12) a factor concerning the facts and circumstances of the case that constitutes a basis for a life sentence; (13) a factor in his character, history or background that constitutes the basis for a life sentence; and (14) any of the factors, alone or in combination, constitutes the basis for a life sentence.

tor. In *Steiger* the state proved the same aggravating factor as was proved in the present case, that the defendant committed the crime in an especially heinous, cruel or depraved manner, and it also proved that the defendant, in the commission of the crime, had knowingly created a grave risk of death to a person other than the victim. In *Daniels*, the state proved the same aggravating factor as was proved in the present case, that the defendant had committed the crime in an especially cruel manner.

With respect to mitigants, in *Steiger*, two of the three judges on the three judge sentencing panel found that the defendant had proved that his mental capacity was impaired, while one of the judges found no mitigating factor. In *Steiger*, however, unlike the present case, the defendant presented testimony of severe schizophrenia. In *Daniels*, the jury disagreed on the issue of whether the defendant had proved a mitigating factor. At least one of the offered mitigating factors, substantial duress, has no counterpart in the present case. In addition, the defendant in *Daniels* presented evidence of organic brain dysfunction. Thus, the panel's decision in the present case was based on evidence significantly different from that offered by the defendants in *Steiger* and *Daniels*. Accordingly, the imposition of a sentence of death in the present case is not inconsistent with the imposition of a sentence of life imprisonment in those two cases.

In four of the seven similar cases, *Griffin, Correa, Roseboro* and *Wood*, the sentencers found both an aggravating factor and a mitigating factor or factors. In *Griffin, Roseboro* and *Wood* the state proved the same aggravating factor as was proved in the present case, that the defendants had committed the crimes in an especially heinous, cruel or depraved manner. In *Correa*, the state proved that the defendant had committed

the crime in the expectation of receiving something of pecuniary value.

With respect to mitigants, in *Griffin* and *Correa*, the sentencers found that the defendants had proved at least one unspecified mitigating factor. In *Griffin*, at least twelve of the mitigating factors claimed by the defendant have no counterpart in the list of mitigating factors claimed by the defendant in the present case.[69] In *Correa*, at least twelve of the mitigating factors claimed did not have a counterpart in the list of mitigating factors offered by the defendant in the present case.[70] Significantly, in both *Griffin* and *Correa*, unlike

[69] The mitigating factors claimed by the defendant in *Griffin* were: (1) the role and actions of the codefendant remained uncertain; (2) the defendant had no record of criminal activity other than a juvenile matter; (3) there was no evidence that the defendant had a violent nature other than the crime for which she was convicted; (4) the defendant was an active and involved mother; (5) the defendant was a loving and devoted grandmother; (6) the defendant took care of a profoundly retarded child, making the child part of the defendant's family; (7) the defendant welcomed her children's friends into her home when they were in need; (8) the quality of the defendant's work with the handicapped; (9) the defendant went back to school to earn her high school degree and attend college after raising her children; (10) the defendant's voluntary involvement in community activities; (11) the defendant's generous dealings with others; and (12) the defendant provided positive contributions to the lives of her children, grandchildren and friends.

[70] The mitigating factors claimed by the defendant in *Correa* were: (1) the defendant was criminally liable as an accessory and his participation in the offense was relatively minor; (2) the defendant was not the one who shot the victims; (3) there remained a lingering doubt as to whether the defendant shot the victims; (4) the defendant was a good man and a loving husband; (5) the defendant was the father of two young children; (6) the defendant had no prior record of criminal convictions in Colombia; (7) the defendant was a member of a large, close, loving and supportive family; (8) the defendant had positive relationships with his family who indicated that they would support him if he was incarcerated; (9) the allure of the illicit drug trade significantly influenced the defendant's judgment; (10) the defendant wrote letters for his sister and another individual claiming ownership of cocaine found at their apartment; (11) the victims were drug dealers who knowingly and voluntarily involved themselves in a violent and dangerous business; and (12) during the months of separation from his family, the defendant exhibited weaknesses in his personality that had not been exhibited in Colombia.

in this case, the extent of the defendant's responsibility for the respective crimes was brought into question. We therefore conclude that the life sentences imposed in those cases are not inconsistent with sentence in the case under review. See *Cobb II*, supra, 251 Conn. 520; *State* v. *Webb*, supra, 238 Conn. 549.

In *Wood*, the jury found that the defendant had proved the mitigating factor that his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of the law was significantly impaired. Unlike the defendant in the present case, however, the defendant in *Wood* offered evidence of explosive disorder, major depression and antisocial personality disorder as well as atypical psychosis, a paranoid schizophrenic process and a potential for transient psychotic states. The defendant in the present case, in support of his two claimed mitigating factors of significant impairment, offered evidence of severe mixed personality disorder with borderline schizoid, paranoid and depressive traits. In determining that the defendant in the present case did not prove these mitigating factors, the panel relied on significantly different evidence than that offered by the defendant in *Wood*. Accordingly, we conclude that that determination by the panel in the present case was not inconsistent with the decision of the sentencer in *Wood*.

In *Roseboro*, the sentencer, a three judge panel, found the factual underpinnings for the defendant's claimed nonstatutory mitigating factor that he was well behaved and well-adjusted while incarcerated.[71] The panel also

[71] The panel in *Roseboro* stated: "The court finds that [the defendant] will conform well in situations of institutional confinement and adjust as needed to proper authority.

"The finding of a mitigating factor in no way subtracts from the horrendous nature of these crimes. The court believes that these were crimes of such immense proportions that they defy the use of proper adjectives. They were so distasteful that the panel has no doubt that the defendant deserves to face the most dire consequences for his act. . . .

"As far as this court is concerned, the [capital felony] statute as it presently

concluded, relying on *Skipper* v. *South Carolina*, supra, 476 U.S. 4–5,[72] that it had no discretion to determine whether the established factual claim was mitigating in nature so as to constitute the basis for a sentence less than death. Subsequent to the panel's decision in *Roseboro*, however, we recognized in *Cobb II* that proof of "the factual basis of [the defendant's mitigating] claim . . . would not compel a conclusion that the defendant, as a matter of law, proved the existence of mitigation." *Cobb II*, supra, 251 Conn. 492–93. Rather, "§ 53a-46a (d) contemplates that a capital sentencer may reject a proven proposed mitigant on the ground that, under all of the facts and circumstances of the case, the factor does not 'extenuate or reduce the degree of [the defendant's] culpability or blame for the offense or . . . otherwise constitute a basis for a sentence less than death.' " Id., 495.

---

exists leaves the court no real choice. This is so since the existence of any mitigating factor eliminates the death penalty regardless of how egregious the crime is. However, [the defendant's] conduct in killing three innocent people is so intolerable and so outrageous to this court that the best interests of the citizens of this state demands that he be removed from society and not allowed to return for the rest of his natural life."

[72] The court stated that "[a]fter examining the case of [*Skipper* v. *South Carolina*, supra, 476 U.S. 1], we find the court is bound to consider as a mitigating factor the evidence relating to the defendant's behavior while in confinement. The facts of this case are stronger than those in the *Skipper* case, which indicated that the fact that a prisoner was well-behaved and well-adjusted while incarcerated, supports favorable inferences regarding his probable future conduct if sentenced to life imprisonment. In the words of the United States Supreme Court, '[T]here is no question but that such inferences would be "mitigating" . . . .' [Id., 4.]" The court in *Skipper*, however, had concluded that "the jury *could* have drawn favorable inferences from . . . testimony regarding [the] petitioner's character and his probable future conduct if sentenced to life in prison"; (emphasis added) *Skipper* v. *South Carolina*, supra, 4; and that such inferences "*might* serve 'as a basis for a sentence less than death.' " (Emphasis added.) Id., 5. The court did not conclude that such testimony would *compel* a finding of mitigation. Indeed, the court noted that "it is true that any such inferences would not relate specifically to [the] petitioner's culpability for the crime he committed . . . ." (Citation omitted.) Id., 4.

In this case, the panel also found that the defendant had proved the underlying factual basis of his claimed nonstatutory mitigating factor that he had been a model prisoner at all times since his incarceration for the murders. The panel further concluded, however, in accordance with *Cobb II*, that, in light of all of the facts and circumstances of the present case, this proved fact was not mitigating in nature. We recognize the apparent inconsistency between the panel's conclusion in this case and the conclusion of the panel in *Roseboro*. This inconsistency does not, however, mean that this case is an outlier. First, as we have noted, the panel's finding in *Roseboro* may have been based on a misunderstanding of the governing law.[73] Second, proportionality review does not "require that the capital case before the court must affirmatively be shown, on [a scale of moral blameworthiness], to have been quantitatively different from all other cases in which the death penalty was not imposed and, absent such an affirmative showing, to [require reversal of] the sentence." *State* v. *Webb*, supra, 238 Conn. 501. Rather, the search is "for a gross disparity between the case on review and other cases within the selected pool of similar cases." Id., 501–502. As we have noted, § 53a-46a (d) contemplates that similar proved facts will be mitigating in nature in some cases, but not in others. To conclude that the apparent inconsistency between the panel's determination in the present case and the panel's determination in *Roseboro* constitutes a "gross disparity" would be, in effect, to conclude that, when a sentencer in a given case, for unspecified reasons—perhaps because of a misunderstanding of the law—has determined that a proved fact constitutes the basis for a sentence less than death, that determination then becomes the standard for sen-

---

[73] We also note, however, that in *Roseboro*, unlike in this case, there was evidence that the defendant had been a well behaved prison inmate *before* he committed the crime for which he was charged with capital felony.

tencers in all subsequent capital felony cases. Under such a rule, if a sentencer in a single case concluded, for example, that the fact that a defendant had earned a college degree was mitigating, then the imposition of the death penalty on college educated defendants would be precluded in all similar cases. Such a rule would be inconsistent with § 53a-46a (d), with common sense and with fundamental fairness. We already have concluded in this opinion that the panel in the present case was not compelled to conclude that the defendant's good behavior in prison was mitigating. Accordingly, we conclude that the panel's determination in *Roseboro* that the defendant's good behavior in prison was mitigating does not establish that this case is an outlier.

Finally, we address the defendant's implicit claim that, in the absence of heightened premeditation, and in all but the most extreme cases, the imposition of the death sentence in cases involving domestic disputes is inherently disproportionate because such cases involve " 'mad acts prompted by wild emotion . . . .' " (Citation omitted.) We note that statutory proportionality review pursuant to § 53a-46b does not contemplate review of this type of claim. Rather, such claims arise under the eighth amendment. *State* v. *Webb*, supra, 238 Conn. 510 (traditional proportionality review, involving claims that imposition of death penalties for certain categories of crime is inherently disproportionate, is not incorporated in § 53a-46b, but "is simply another term for analysis under either the eighth amendment's prohibition against cruel and unusual punishment or under our state constitutional counterpart"). Thus, in effect, the defendant claims that the imposition of the death penalty on a defendant who committed the capital offense while in the grip of an emotional disturbance violates that constitutional provision, even if the emotional disturbance does not meet the requirements of

§ 53a-54a (a).[74] In other words, the defendant claims that, if a defendant acted under the influence of any emotional disturbance, regardless of whether it had a reasonable explanation or excuse, the imposition of the death penalty would be, per se, disproportionate. We disagree. Assuming, without necessarily agreeing, that the eighth amendment prohibits the imposition of the death penalty on a defendant who committed the offense under the influence of extreme emotional disturbance, we conclude that § 53a-54a (a) provides an adequate constitutional safeguard.[75] To conclude otherwise would be to render the extreme emotional disturbance defense limitless and standardless. See *State* v. *Dehaney*, supra, 261 Conn. 377 (subjective test for establishing defense of extreme emotional defense "would . . . eliminate the barrier against debilitating individualization of the standard" [internal quotation marks omitted]). Accordingly, we reject this claim.

As we stated in *Cobb II*, supra, 251 Conn. 520–21, we find again today that "[o]ur statement in *Webb* is an apt summary of the process of proportionality review that we have undertaken in the present case. 'On the basis of this analysis, of our scrupulous examination of all of the material presented to us regarding the imposition of the death penalty in the present case, and of our careful review of all of the material presented to us regarding the imposition of the sentences in the other

---

[74] If a defendant charged with a capital offense could establish that he was under the influence of an extreme emotional disturbance that has a reasonable explanation or excuse, pursuant to § 53a-54a (a) he would establish a defense to murder and could not be convicted of the offense.

[75] This does not mean that the defendant is not constitutionally entitled to claim extreme emotional disturbance as a nonstatutory mitigating factor if he is unable to establish a defense under § 53a-54a (a). It does mean, however, that proof of an extreme emotional disturbance that does not meet the requirements of that statute is not per se mitigating. Rather, the sentencer constitutionally may determine that the defendant's subjective emotional disturbance is not mitigating in nature under the facts and circumstances of the particular case.

[eight] similar cases, we conclude that the death sentence in this case is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." General Statutes § 53a-46b (b) (3). There is nothing freakish, arbitrary, wanton or aberrational about the sentence in this case. There is no pattern or trend evident in similar cases with respect to which this sentence is inconsistent. This case is not an outlier. The various sentencers' evaluations of similar aggravants and claimed mitigants in the other similar cases is reasonably consistent with the [panel's] evaluation of the aggravants and claimed mitigants in this case. The death sentence in this case is reasonably consistent with the sentences of death imposed in the [other similar case] in which that sentence was imposed, considering the aggravants found and the mitigants claimed. The death sentence in this case is reasonably consistent with the sentences of life imprisonment in the [seven] similar cases in which that sentence was imposed, considering the aggravants found and the mitigants claimed; there is nothing freakish, aberrational or arbitrary in [the panel's] having imposed the death penalty in this case and [the sentencers'] having declined to do so in the other [seven] cases. The sentence in this case is reasonably consistent with the sentences imposed in the pool of similar cases. . . .' *State* v. *Webb,* supra, 238 Conn. 550–51."

The judgment is affirmed.

In this opinion PALMER, ZARELLA, FOTI, SCHALLER and MIHALAKOS, Js., concurred.

NORCOTT, J., dissenting. Again, I assert my opposition to capital punishment. See *State* v. *Cobb,* 251 Conn. 285, 543, 743 A.2d 1 (1999) (*Norcott, J.,* dissenting), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d

64 (2000).[1] I continue to dissent from decisions of this court that ultimately conclude that the death penalty can be administered in accordance with the principles of fundamental fairness set forth in our state's constitution. Accordingly, I respectfully dissent in the present case as well.

The new millennium is now upon us, and my opposition to the death penalty remains "steadfast and unwavering." *State* v. *Courchesne*, 262 Conn. 537, 584, 816 A.2d 562 (2003) (*Norcott, J.*, concurring). The passage of a few years time has done nothing to blunt the pervasive and insidious influence of race and poverty in the administration of the death penalty.[2] Indeed, in a

[1] In my dissenting opinion in *State* v. *Cobb*, supra, 251 Conn. 543, I explained, in great detail, why the "death penalty cannot withstand constitutional scrutiny because it allows for arbitrariness and racial discrimination in the determination of who shall live or die at the hands of the state." I discussed the insidious influence of a defendant's poverty; id., 548–49; as well as the pervasive evil of racial discrimination in capital sentencing; id., 545–48; including the shocking results of a study that "revealed how the race of the defendant was . . . a more accurate predictor of capital punishment than the severity of the crime or the defendant's criminal background." Id., 547. I also discussed the alarming possibility of actual innocence, which is the "real fear presented by [death penalty] cases . . . [i]n a system that is so inherently flawed with arbitrariness and lack of fairness . . . ." Id., 549. I proposed that Connecticut "remain on a higher plane, and further suggest[ed] that if this state has not yet begun executions for over thirty years, it should not begin now, when people—particularly those in our legal community—simply do not have faith in it anymore." Id., 550–51. Finally, I noted that, in light of the availability of life imprisonment without the possibility of parole as an alternate penalty, "the continuation of the death penalty simply makes no sense as we approach a hopefully more enlightened new millennium." Id., 552.

Indeed, I echoed this aspiration in my dissent in *State* v. *Webb*, 252 Conn. 128, 147, 750 A.2d 448 (*Norcott, J.*, dissenting), cert. denied, 531 U.S. 835, 121 S. Ct. 93, 148 L. Ed. 2d 53 (2000), wherein I stated that I was "optimistic that very early in the twenty-first century we will all witness the abolition of this practice by Connecticut as a state and the United States as a country."

[2] See, e.g., C. Ogletree, "Black Man's Burden: Race and the Death Penalty in America," 81 Or. L. Rev. 15, 23–31 (2002) (impact of racial discrimination in jury selection and imposition of capital punishment); D. Vick, "Poorhouse Justice: Underfunded Indigent Defense Services and Arbitrary Death Sentences," 43 Buff. L. Rev. 329, 338 (1995) (describing shortcomings of indigent

thought provoking article describing how the influence of race, poverty, politics, and the systemic breakdown of judicial safeguards very nearly led to the execution of a mentally disabled, innocent man, Professor Eric M. Freedman provided a harrowing reminder of how our nation's system for administering this highest of penalties remains riddled with opportunities for what is truly an irreversible error. See generally E. Freedman, "Earl Washington's Ordeal," 29 Hofstra L. Rev. 1089 (2001).[3] Moreover, in the years since I wrote my dissent in *State* v. *Cobb*, supra, 251 Conn. 543, the antideath penalty tide has continued to rise, both in Connecticut and our sister jurisdictions, as the grave flaws inherent in the administration of this ultimate penalty increasingly are recognized. See J. Kirchmeier, "Another Place Beyond Here: The Death Penalty Moratorium Movement in the United States," 73 U. Colo. L. Rev. 1, 31–39 (2002) (increasing public expression of concern about death penalty administration by bar associations and judiciary); id., 43–45 (increasing degree of legislative support for moratoria or abolition, especially in Nebraska, New Hampshire and Nevada); R. Tabak, "Finality Without Fairness: Why We are Moving Towards Moratoria on Executions, and the Potential Abolition of Capital Punishment," 33 Conn. L. Rev. 733, 739–45 (2001) (same). Indeed, Maryland and Illinois already have imposed moratoriums on the use of the death penalty, in recognition of the racial disparities

defense system; "[a]ny system for selecting offenders to die for their crimes that is so strongly influenced by a legally irrelevant consideration such as the offender's poverty is operating arbitrarily").

[3] As Professor Freedman wrote: "[P]erhaps progress will come less from an exercise in abstraction than one in imagination: Any one of us could wind up in Earl Washington's position, and what then?" E. Freedman, supra, 29 Hofstra L. Rev. 1109. Indeed, since 1973, there have been 108 exonerations of prisoners from the death rows of twenty-five states because of evidence of their innocence; on average, five death row prisoners are exonerated each year. See Death Penalty Information Center, "Innocence and the Death Penalty," http://www.deathpenaltyinfo.org (last visited June 4, 2003).

and other systemic defects attendant in the capital sentencing process.[4] See, e.g., F. Clines, "Death Penalty is Suspended in Maryland," N.Y. Times, May 10, 2002, p. A1; J. Kirchmeier, supra, 73 U. Colo. L. Rev. 5. I would urge Connecticut to join these forward thinking jurisdictions, and at least consider a moratorium on the ultimate penalty. Until such time, however, I respectfully dissent.

---

[4] I note that in January, 2003, following the two year moratorium on the imposition of the death penalty, Governor George Ryan of Illinois cited the dangers of wrongful capital convictions, and commuted the death sentences of that state's entire death row population to life imprisonment without the possibility of parole. See, e.g., A. Lasker, "First One, Then Another . . . Then Everyone," Chi. Daily L. Bull., January 13, 2003, p. 1.

I also note, with regret, that the newly elected governor of Maryland has proceeded in the opposite direction from Illinois, and in January, 2003, lifted that state's moratorium on the imposition of the death penalty. See, e.g., A. Liptak, "Top Lawyer In Maryland Calls for End To Executions," N.Y. Times, January 31, 2003, p. A19.